**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| DOE I; DOE II; IVY HE; DOE III; DOE IV; DOE V; DOE VI; CHARLES LEE; ROE VII; ROE VIII; LIU GUIFU; DOE IX; WEIYU WANG, and those individuals similarly situated, | No. 15-16909 D.C. No. 5:11-cv-02449-EJD |
| *Plaintiffs-Appellants*, | |
| v. | ORDER |
| CISCO SYSTEMS, INC.; JOHN CHAMBERS; FREDY CHEUNG, AKA Zhang Sihua; DOES, 1-100, | |
| *Defendants-Appellees*. | |

Filed September 3, 2024

Before:  A. Wallace Tashima, Marsha S. Berzon, and
Morgan Christen, Circuit Judges.

Order;
Statement by Judge Berzon;
Dissent by Judge Bumatay

# SUMMARY[*]

## Alien Tort Statute

The panel denied a petition for panel rehearing and a petition for rehearing en banc in a case in which the panel affirmed in part and reversed in part the district court's judgment dismissing claims under the Alien Tort Statute ("ATS") and the Torture Victim Protection Act, and remanded.

The action was brought by practitioners of Falun Gong who alleged that they or family members were victims of human rights abuses by the Chinese Communist Party and Chinese government officials and that these abuses were enabled by technological assistance of U.S. corporation Cisco Systems, Inc., and two Cisco executives.

Respecting the denial of rehearing en banc, Judge Berzon, joined by Judges Tashima and Paez, wrote that the decision to deny rehearing en banc was correct because this court is not free to depart from *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), which provides a two-step test for determining whether a cause of action may lie under the ATS. She wrote that the panel majority faithfully applied the *Sosa* framework to the facts of this case.

Judge Bumatay, joined by Judges Callahan, Ikuta, Bennett, R. Nelson, and VanDyke, dissented from the denial of rehearing en banc. He wrote that the court made three main errors in refusing to reconsider the case en banc. First,

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

the court failed to restrict ATS liability to causes of action comparable to historically recognized torts. Second, the court violated the separation of powers in pronouncing a new cause of action—even though Congress has continued to legislate in this very area. Third, the court ignored serious foreign-policy concerns—permitting federal courts to intrude in the delicate relations with another world superpower.

**ORDER**

Judge Tashima and Judge Berzon voted to deny the petition for panel rehearing and recommended denying the petition for rehearing en banc. Judge Christen voted to grant the petition for panel rehearing and the petition for rehearing en banc. A judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc consideration. Fed. R. App. P. 35(a). Judges Wardlaw, Nguyen, and Collins did not participate in the deliberations or vote in this case.

Appellees' Petition for Panel Rehearing and Rehearing En Banc, filed August 11, 2023, is DENIED.

BERZON, Circuit Judge, with whom TASHIMA and PAEZ, Circuit Judges, join, respecting the denial of rehearing en banc:

The Alien Tort Statute ("ATS") provides in full: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of

the law of nations or a treaty of the United States." 28 U.S.C. § 1350. The ATS is "only jurisdictional" and does not itself provide a cause of action. *Sosa v. Alvarez-Machain*, 542 U.S. 692, 712 (2004). How then should a court determine what causes of action are cognizable as "violation[s] of the law of nations?"

Judge Bumatay offers one answer—those actions that the First Congress had "in mind" when it enacted the ATS: "violation of safe conducts, infringement of the rights of ambassadors, and piracy." Dissent from Denial of En Banc at 15 (quoting *Sosa*, 542 U.S. at 724). Absent congressional action, Judge Bumatay argues, judicial recognition of additional causes of actions or forms of liability is "extraordinarily disfavored if not dead letter." Dissent from Denial of En Banc at 25. That view has been championed by several Supreme Court justices, but, critically, it has never gained the support of a majority of the Court. Instead, *Sosa* provides a different answer to this question than does Judge Bumatay. As a court of appeals, we are not free to depart from that binding precedent.

*Sosa* provides a two-step test for determining whether a cause of action may lie under the ATS. At step one, courts ask whether the claim "rest[s] on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of" the torts recognized to constitute a violation of the law of nations at the time the ATS was enacted. *Sosa*, 542 U.S. at 725.

At step two, ''it must be determined further whether allowing [a] case to proceed under the ATS is a proper exercise of judicial discretion, or instead whether caution requires the political branches to grant specific authority before [a new form of liability] can be imposed." *Jesner v.*

*Arab Bank, PLC*, 584 U.S. 241, 258 (2018). Step two requires consideration of the foreign policy implications and "practical consequences of making [a] cause available to litigants in the federal courts." *Sosa*, 542 U.S. at 732–33. Additionally, courts must consider whether "there are sound reasons to think Congress might doubt the efficacy or necessity of a . . . remedy" before recognizing a new cause of action. *Jesner*, 584 U.S. at 264 (quoting *Ziglar v. Abbasi*, 582 U.S. 120, 137 (2017)).

The panel majority faithfully applied the *Sosa* framework to the facts of this case. Judge Bumatay does not really take issue with the majority's application of *Sosa*. Instead, he recasts *Sosa*'s standard in a new mold. In service of this endeavor, he relies largely on plurality opinions and concurrences and invokes issues not raised by the parties, violating the principle of party presentation, *United States v. Sineneng-Smith*, 590 U.S. 371, 375–76 (2020). Because this Court is not free to depart from *Sosa*, the decision to deny rehearing en banc was correct.

# I

The panel majority in this case began by considering whether aiding and abetting liability is "sufficiently definite and universal to be a viable form of liability under the ATS." *Doe I v. Cisco Sys., Inc.*, 73 F.4th 700, 718 (9th Cir. 2023). In answering this question, the panel majority looked to the material *Sosa* instructs courts to consider: ''those sources we have long, albeit cautiously, recognized,'' which include treaties as well as "the customs and usages of civilized nations; and, as evidence of these, . . . the works of [qualified] jurists and commentators." *Sosa*, 542 U.S. at 733–34 (quoting *The Paquete Habana*, 175 U.S. 677, 700 (1900)). In doing so, the panel majority relied heavily on the

careful reasoning of Judge Katzmann in *Khulumani v. Barclay National Bank Ltd.*, 504 F.3d 254 (2d Cir. 2007), who reviewed the decisions of several international tribunals, multiple treaties and conventions, the actions of the U.N. Security Council, and the Rome Statute of the International Criminal Court.    504 F.3d at 270–77 (Katzmann, J., concurring).  In *Khulumani*, Judge Katzmann concluded that aiding and abetting liability was sufficiently well defined and universally recognized under international law to be cognizable under the ATS.  *Id.* at 277.

*Khulumani* and the panel majority's application of *Sosa* and recognition of aiding and abetting liability under the ATS is in keeping with every other circuit to have addressed the issue.  *See Aziz v. Alcolac, Inc.*, 658 F.3d 388, 396 (4th Cir. 2011); *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 258–59 (2d Cir. 2009); *Romero v. Drummond Co.*, 552 F.3d 1303, 1315 (11th Cir. 2008) (citing *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1157–58 (11th Cir. 2005)); *cf. Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 32 (D.C. Cir. 2011), *vacated on other grounds*, 527 Fed. Appx. 7 (D.C. Cir. 2013).[1]

Further, nothing in *Sosa* or the circuit court opinions that have held aiding and abetting liability cognizable under the ATS suggests that the tort-by-tort analysis of aiding and abetting liability that Judge Bumatay champions is required. Importantly, Cisco has never argued for such an approach.

---

[1] Although she dissented from the panel majority's analysis of aiding and abetting liability under *Sosa*'s step two, Judge Christen stated that "[t]he majority's careful and cogent analysis of aiding and abetting liability under the Alien Tort Statute . . . is consistent with the views of our sister circuits, and in an appropriate case, I would likely join it." *Cisco*, 73 F.4th at 746 (Christen, J., concurring in part and dissenting in part).

In its motion to dismiss before the district court and in both its answering brief and its petition for rehearing en banc before this Court, Cisco has consistently argued that aiding and abetting liability is generically unavailable under the ATS, not that it is unavailable for the particular underlying torts alleged in the operative complaint. Nor has Cisco ever contested the availability of a cause of action under the ATS for four of the plaintiffs' seven alleged violations—torture, prolonged arbitrary detention, disappearance, and extrajudicial killing—if committed directly. The principle of party presentation commands that we "rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." *Sineneng-Smith*, 590 U.S. at 375 (quoting *Greenlaw v. United States*, 554 U.S. 237, 243 (2008)).

Notably, the panel majority's generic approach is consistent with that employed by the Supreme Court in *Jesner*. The *Jesner* Court "assumed" that inflicting death or injury by terrorism as well as "knowingly and purposefully facilitat[ing] banking transactions to aid, enable, or facilitate . . . terrorist acts" constituted "crimes in violation of well-settled, fundamental precepts of international law" before considering whether foreign corporations may be liable under the ATS as a general matter. 584 U.S. at 248. The panel majority took the same approach here, where some of the underlying causes of action were unchallenged, leaving it to the district court to "consider in the first instance the viability of the substantive claims under the ATS to the degree that viability is contested." *Cisco*, 73 F.4th at 716.

## II

Judge Bumatay also offers a conception of the separation-of-powers concerns included in *Sosa*'s second

step that contradicts governing law. *Sosa* requires that a court consider whether Congress "might doubt the efficacy or necessity of a . . . remedy" before recognizing a new cause of action under the ATS. *Jesner*, 584 U.S. at 264 (quoting *Ziglar v. Abbasi*, 582 U.S. 120, 137 (2017)). The panel majority engaged in this exact inquiry. *Cisco*, 73 F.4th at 722–24. Contrary to Judge Bumatay's argument, neither the principles of *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), nor the Supreme Court's ATS jurisprudence post-*Sosa* command that the answer to this question "should *always* be Congress." *See* Dissent from Denial of En Banc at 32 (emphasis in original).

The *Sosa* majority explicitly considered and rejected Justice Scalia's contention in his partial concurrence that *Erie* and the modern, "positivistic" conception of the common law on which *Erie* relied had "close[d] the door to further independent judicial recognition of actionable international norms." 542 U.S. at 729; *see id.* at 744–46 (Scalia, J., concurring in part and concurring in judgment). The *Sosa* majority explained:

> We think an attempt to justify such a position would be particularly unconvincing in light of what we know about congressional understanding bearing on this issue lying at the intersection of the judicial and legislative powers. The First Congress, which reflected the understanding of the framing generation and included some of the Framers, assumed that federal courts could properly identify some international norms as enforceable in the exercise of § 1350 jurisdiction. We think it would be unreasonable to assume that the

First Congress would have expected federal courts to lose all capacity to recognize enforceable international norms simply because the common law might lose some metaphysical cachet on the road to modern realism.  Later Congresses seem to have shared our view. The position we take today has been assumed by some federal courts for 24 years, ever since the Second Circuit decided *Filartiga v. Pena-Irala*, 630 F.2d 876 (C.A.2 1980), and for practical purposes the point of today's disagreement has been focused since the exchange between Judge Edwards and Judge Bork in *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774 (C.A.D.C. 1984).  Congress, however, has not only expressed no disagreement with our view of the proper exercise of the judicial power, but has responded to its most notable instance by enacting legislation supplementing the judicial determination in some detail.

*Id.* at 730–31 (citing *id.* at 728 (discussing the Torture Victim Protection Act)).

*Sosa* further considered and rejected Justice Scalia's contention in his concurrence that the ATS should be read to "preclude federal courts from recognizing any further international norms as judicially enforceable."  *Id.* at 729. Instead, the Court held that claims under the ATS "must be gauged against the current state of international law."  *Id.* at 733.  In the twenty years since *Sosa* was decided, no majority of the Supreme Court has ever held that "separation-of-

powers concerns almost entirely foreclose the recognition of new causes of action under the ATS." Dissent from Denial of En Banc at 25.

*Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108 (2013), for example, held simply that the ATS does not apply extraterritorially. 569 U.S. at 124. *Nestlé USA, Inc. v. Doe*, 593 U.S. 628 (2021), relied on *Kiobel* in holding that "[t]o plead facts sufficient to support a domestic application of the ATS, plaintiffs must allege more domestic conduct than general corporate activity." 593 U.S. at 634. *Jesner* held that foreign corporations cannot be liable under the ATS. 584 U.S. at 272. The majority opinion in *Jesner* considered but again declined to adopt the argument that "a proper application of *Sosa* would preclude courts from ever recognizing any new causes of action under the ATS." *Id.* at 265. This Court is not free to adopt a view twice rejected by the Supreme Court in favor of one advocated for in minority concurrences.

Further, as the panel majority explained, *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994), is inapposite here. *See Cisco*, 73 F.4th at 722. As *Sosa* makes clear, the scope of liability under the ATS is determined by reference to international law not federal statutes. *See* 542 U.S. at 733. Perhaps more to the point for present purposes, *Central Bank* did not announce a presumption *against* aiding and abetting liability; it simply rejected a presumption *favoring* such liability. The panel majority's aiding and abetting analysis is not based on any presumption of aiding and abetting liability. It is based on a *de novo* consideration of well-developed international law materials, applying no presumption one way or the other. *Central Bank*'s rejection of a presumption of aiding and abetting liability for federal civil law is for both these

reasons irrelevant to the question of whether such liability is "sufficiently definite" and universal under *international law*. *See id.* at 732.

## III

Judge Bumatay's invocation of foreign policy considerations, relevant to *Sosa*'s step two, is similarly off-base. As the majority opinion explains, recognizing aiding and abetting liability here "does not trigger *Sosa*'s principal foreign policy concern—that ATS claims could impose liability on sovereign nations for behavior with respect to their own citizens." *Cisco*, 73 F.4th at 720. Plaintiffs here do not "seek to hold China and its government accountable for purported violations of international law." Dissent from Denial of En Banc at 36. No claims were brought against China or Chinese government officials. Claims for aiding and abetting liability against a U.S. corporation do not present the same foreign policy concerns as in *Doe v. Qi*, 349 F. Supp. 2d 1258 (N.D. Cal. 2004), for example, where the defendants were a former mayor of Beijing and a regional governor. 349 F. Supp. 2d at 1267–68.

The silence of the U.S. Department of State further distinguishes the foreign policy implications here from those in *Doe v. Qi*, where both the Department of State and the Chinese government submitted statements of interest. *See id.* at 1296–97, 1300. The probative value of the United States' failure to comment on this case does not rest on an expectation that the Department of State monitor the activities of "all 94 federal district courts." Dissent from Denial of En Banc at 38 (quoting *Cisco*, 73 F.4th at 750 (Christen, J., concurring in part and dissenting in part)). This Court first heard oral argument in this case on April 18, 2017. Submission was then vacated while the Supreme

Court decided *Jesner* and *Nestlé*. We held oral argument again after *Nestlé* was decided by the Supreme Court. At no point in the seven years since that first oral argument has the United States taken steps to advise this court of its views or otherwise taken action regarding this case. And the United States has remained silent even since Cisco first argued, in its petition for rehearing en banc, that this Court should solicit the views of the national government. Cisco was of course free to ask the United States to chime in with its views on the foreign policy implications of the case at the petition for rehearing en banc stage; either it did not do so or the government chose not to come forward.

Thus, it is even clearer now than it was at the time the opinion was filed that the foreign policy implications here are not of sufficient concern to the United States government to trigger its involvement at this juncture. Why that may be we do not know. In any event, the panel made clear that on remand, the District Court may request views from the Department of State. *Cisco*, 73 F.4th at 722.

Moreover, whether to ask the government for its views is within the discretion of the panel. An en banc panel cannot productively spend its energies attempting to cabin that discretion, which is a subject more worthy (if it has any worth at all) of a rules committee. It would have been foolish in the extreme to have taken a case en banc for a panel's discretionary decision not to ask the government for its views.

Although Judge Bumatay takes a different view of the foreign policy implications of this case, a difference of opinion regarding prudential concerns as applied to particular facts is an insufficient reason for en banc review.

* * *

*Sosa* instructs that "[f]or two centuries we have affirmed that the domestic law of the United States recognizes the law of nations. It would take some explaining to say now that federal courts must avert their gaze entirely from any international norm intended to protect individuals." 542 U.S. at 729–30 (citations omitted). Averting our gaze is just what the dissent from denial of en banc would have us do. But so long as *Sosa* remains good law, that choice is not ours to make, and that explanation is not ours to provide. The decision not to rehear *Cisco* en banc was correct.

BUMATAY, Circuit Judge, joined by CALLAHAN, IKUTA, BENNETT, R. NELSON, and VANDYKE, Circuit Judges, dissenting from the denial of rehearing en banc:

In 1789, the First Congress passed the Alien Tort Statute ("ATS") to grant federal courts jurisdiction over tort suits involving violations of the "law of nations." Judiciary Act of 1789, ch. 20, § 9, 1 Stat. 73, 77. As a jurisdictional provision, the ATS opened the federal courthouse doors to victims of certain torts. But the statute didn't create those torts itself. Rather, the private right of action must come from somewhere else. So in creating tort liability for violations of international law, we must ask—who gets to decide?

Twenty years ago, Justice Scalia provided a simple answer to this question: "We Americans have a method for making the laws that are over us. We elect representatives to two Houses of Congress, each of which must enact the new law and present it for the approval of a President, whom

we also elect." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 750 (2004) (Scalia, J., concurring). So in deciding what is "so universally disapproved by other nations that it is automatically unlawful" in this country and "automatically gives rise to a private action for money damages in federal courts," we look to one source—"American law—the law made by the people's democratically elected representatives." *Id.* at 751.

Since then, other Justices have expressed similar views. *See, e.g.*, *Jesner v. Arab Bank, PLC*, 584 U.S. 241, 282 (2018) (Gorsuch, J., concurring) ("In our democracy the people's elected representatives make the laws that govern them. Judges do not. The Constitution's provisions insulating judges from political accountability may promote our ability to render impartial judgments in disputes between the people, but they do nothing to recommend us as policymakers for a large nation."). So great is the need to defer to the political branches that several Justices have made clear, outside the "historical torts likely on the mind of the First Congress," "courts *may not* create a cause of action for [other] torts." *Nestlé USA, Inc. v. Doe*, 593 U.S. 628, 640 (2021) (plurality) (Thomas, J., joined by Gorsuch and Kavanaugh, JJ.) (emphasis added). Indeed, for more than 230 years, the Supreme Court has never "invoked the ATS to create a new cause of action." *Id.* at 643 (Gorsuch, J., concurring).

But the Ninth Circuit gives a different answer to this question. When asking who may create a new cause of action for violations of international law, our answer is merely—*two judges of our court*. Today, we do not revisit the view of a divided panel of our court that recognizes a brand-new type of liability—aiding and abetting—for *any* tort claimed under a broad conception of international law.

Because the panel majority viewed this accomplice liability to be "a norm of customary international law," it felt free to inaugurate a new cause of action under the ATS. *See Doe I v. Cisco Sys., Inc.*, 73 F.4th 700, 717 (9th Cir. 2023). The panel majority justified its new creation by claiming that its decision "does not raise separation-of-powers or foreign policy concerns." *Id*. With this decision, our circuit now holds that aiding-and-abetting liability automatically attaches to any tort claiming a violation of international law.

Our answer is, of course, wrong. The ATS, as re-codified, provides that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. By its terms, it is only about jurisdiction. The ATS does not confer broad lawmaking powers on courts, and it says nothing about making new judge-created causes of action. It merely allows aliens to bring suits for certain torts recognized under the law of nations in federal courts.

Contrary to the panel majority's view, the law of nations isn't a freewheeling concept. When it was enacted, it had a definite and limited meaning—it referred to a "modest number of international law violations" for which the general "common law would provide a cause of action." *Sosa*, 542 U.S. at 724; *see also Nestlé*, 593 U.S. at 636 (plurality) (observing that federal courts would recognize torts "under general common law"). And it's widely assumed that the First Congress likely had only "three primary offenses" "in mind" in enacting the ATS: "violation of safe conducts, infringement of the rights of ambassadors, and piracy." *Sosa*, 542 U.S. at 724. True, both the concepts of general common law and international law have changed in the two-and-a-half centuries since its enactment. But that

doesn't mean we have license to create any cause of action so long as we deem it an "international norm." Indeed, such an expansive view might incorporate countless modern international-law customs and norms into domestic law—all enforceable in federal court. Instead, the Court has made clear that we must not fashion a new cause of action if *any* "sound reason[]" exists "to think Congress might doubt the efficacy or necessity of [the new] remedy." *Jesner*, 584 U.S. at 264 (simplified). In this case, sound reasons abound.

We make three main errors in refusing to reconsider this case en banc. First, we failed to restrict ATS liability to causes of action comparable to historically recognized torts. Second, we violated the separation of powers in pronouncing a new cause of action—even though Congress has continued to legislate in this very area. And third, we ignored serious foreign-policy concerns—permitting federal courts to intrude in the delicate relations with another world superpower. All three reasons show that the Ninth Circuit got it wrong here.

First, we flouted the ATS's historical understanding. Relying on modern United Nations documents and other international examples, the panel majority created *universal* aiding-and-abetting liability for all torts claiming a violation of international law. The panel majority proclaimed accomplice liability an "international norm"—without limitation—no matter the tort. But the panel majority didn't justify this sweeping ruling by examining the international norms for each tort alleged. Nor did it attempt to reconcile its views with the history of the ATS. Compared to the historical understanding of the law, there's reason to question whether universal accomplice liability should be part of our federal common law. *See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164,

181 (1994) (holding that, while aiding and abetting is "an ancient criminal law doctrine," it is "at best uncertain in application" for tort liability).  So the panel majority was wrong to claim that universal aiding-and-abetting liability should apply under the ATS.

Second, we violate the separation of powers.  While Congress knows how to delineate accomplice liability, it didn't provide for aiding and abetting in the ATS and we can't presume that Congress meant to include it.  *Id.* at 182 ("[W]hen Congress enacts a statute under which a person may sue and recover damages from a private defendant for the defendant's violation of some statutory norm, there is no general presumption that the plaintiff may also sue aiders and abettors.").  And over the years, including in the ATS's re-codification, Congress has declined to amend the statute to add accomplice liability.  In fact, Congress has already expanded the reach of the ATS—to recognize "torture" as a tort through the Torture Victim Protection Act of 1991 ("TVPA"), 28 U.S.C. § 1350 note.  Absent a signal from Congress to create aiding-and-abetting liability, doing so now usurps the lawmaking role—a function the Constitution gives only to the political branches.

Third, we interfere in international affairs.  When conceived, the ATS's purpose was to *shield* the country from being drawn into disputes with other nations.  *See Jesner*, 584 U.S. at 270 ("The ATS was intended to promote harmony in international relations by ensuring foreign plaintiffs a remedy for international-law violations in circumstances where the absence of such a remedy might provoke foreign nations to hold the United States accountable.").  Our court has now transformed this shield into a *sword* to punish foreign nations through their alleged

aiders and abettors. So rather than promote harmony, we arm the ATS to incite international conflict.

And this is a worrisome undertaking—with real world consequences. Twenty years ago, the State Department warned us about the foreign-policy implications of confronting China in a case very much like this one. *See* Letter from William H. Taft, IV, Dep't of State, to Assistant Att'y Gen. Robert D. McCallum, Re: *Doe v. Qi* (N.D. Cal.) (Sep. 25, 2002) ("2002 State Dep't Letter").[1] It warned of the concern for reciprocal actions against our citizens and officials. *Id*. And there's little reason to think this concern has eased over the last 20 years. Indeed, the panel majority refused to request the view of the United States, over Judge Christen's dissent. The likely reason why? The United States has long opposed the creation of a cause of action for aiding-and-abetting liability under the ATS. *See Nestlé*, 593 U.S. at 633. So our actions intrude into the executive branch's function, touching on foreign-policy questions that we have no competence to understand.

Because we overstepped our authority to create new liability under the ATS, I respectfully dissent from the denial of rehearing en banc.

## I.

### A.

The ATS was passed by the First Congress as part of the Judiciary Act of 1789. In this Act, Congress created the federal courts and defined their jurisdiction. The original text provided that federal courts:

---

[1] Available at: 2009-2017.state.gov/documents/organization/57535.pdf.

> shall also have cognizance, concurrent with the courts of the several States, or the circuit courts, as the case may be, of all causes where an alien sues for a tort only in violation of the law of nations or a treaty of the United States.

Judiciary Act of 1789, ch. 20, § 9, 1 Stat. 73, 77. At the time, the ATS was enacted to protect our fledgling nation from international conflict arising from uncompensated violations of the law of nations. By giving jurisdiction to federal courts to redress violations of international law, the ATS ensured our country's compliance with the law of nations and prevented other nations from seeking vindication against our country through other means, such as war. *See* Anthony J. Bellia, Jr. & Bradford R. Clark, *The Alien Tort Statute and the Law of Nations*, 78 U. Chi. L. Rev. 445, 448–49 (2011).

The phrase "law of nations" had a distinct, narrow meaning in 1789. The idea of the law of nations took root in early European thought as political philosophers and legal scholars sought to explain interactions between countries. By 1789, the term "law of nations" had been extensively discussed and explained by well-known legal scholars. *See* 4 William Blackstone, Commentaries *66–67 (1769) ("The law of nations is a system of rules, deducible by natural reason, and established by universal consent among the civilized inhabitants of the world[.]"); Emmerich de Vattel, Les Droit de gens [The Law of Nations], 30 (1797) (Kapossy & Whatmore eds., 2011) (defining the "law of nations" as "the science which teaches the rights subsisting between nations or states, and the obligations correspondent to those rights"). At its heart, the "law of nations" identified customs that governed interactions between countries. *See* Anthony J. Bellia, Jr., and Bradford R. Clark, *The Federal Common*

*Law of Nations*, 109 Colum. L. Rev. 1, 6 (2009) ("[A] foundational principle of the law of nations" at the Founding "was that each nation should reciprocally respect certain perfect rights of every other nation to exercise territorial sovereignty, conduct diplomatic relations, exercise neutral rights, and peaceably enjoy liberty.").

When the ATS was passed, what torts violated the law of nations was a matter of general law or "general common law." *See Sosa*, 542 U.S. at 739 (Scalia, J., concurring). Under this understanding, "customary international law was not regarded as federal law, but as a species of nonpreemptive 'general law.'" Bellia & Clark, *The Federal Common Law of Nations*, 109 Colum. L. Rev. at 4. Even so, scholarly debate persists about what "torts" would have been considered "in violation of the law of nations" at the time of the First Congress. Looking to Blackstone, the Supreme Court assumed that the First Congress had only three primary violations "in mind" when it enacted the ATS: the violation of safe conducts, infringement of the rights of ambassadors, and piracy. *Sosa*, 542 U.S. at 724. Some view this grouping as too narrow. *See* Bellia & Clark, *The Alien Tort Statute and the Law of Nations*, 78 U. Chi. L. Rev. at 454 (arguing that the ATS also permitted jurisdiction more expansively for "common law tort claims by aliens against United States citizens for intentional injuries to person or property"). Others view it as too broad. *See* Thomas H. Lee, *The Safe-Conduct Theory of the Alien Tort Statute*, 106 Colum. L. Rev. 830, 836 (2006) (positing "that the ATS was enacted [only] to allow aliens to sue . . . for transgressions of safe conducts").[2]

---

[2]  This model of granting federal courts jurisdiction over a substantive area of law is not unique. For example, "[t]he Judiciary Act of 1789

In any case, following *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), which marked the "death of the old general common law," development of torts under the law of nations changed. *Sosa*, 542 U.S. at 741 (Scalia, J., concurring). Today, rather than discern general law, federal courts may only develop "federal common law" that is, in the words of Justice Scalia, "self-consciously 'made' rather than 'discovered.'" *Id.* Because of the nature of this judge-made law, "federal courts must possess some federal-common-law-making authority before undertaking to craft it." *Id.* And grants of jurisdiction are not wholesale invitations to create judge-made law. As the Court has said, "[t]he vesting of jurisdiction in the federal courts does not in and of itself give rise to authority to formulate federal common law[.]" *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640–41 (1981).

Why does this history matter? It matters because, when trying to understand the scope of an old law like the ATS, history *always* matters. And given the ATS's history, we should acknowledge we don't have a free hand to create new causes of action. Indeed, the Supreme Court has outlined

---

conferred on the federal courts jurisdiction over 'all suits . . . in equity.'" *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318 (1999) (simplified). As a purely jurisdictional grant, the substantive law had to come from somewhere else. For that, according to the Court, federal courts are to look to "the principles of the system of judicial remedies which had been devised and was being administered by the English Court of Chancery at the time of the separation of the two countries." *Atlas Life Ins. Co. v. W. I. S., Inc.*, 306 U.S. 563, 568 (1939); *see generally* Owen W. Gallogly, *Equity's Constitutional Source*, 132 Yale L.J. 1213 (2023). So looking to the substantive law at the time of enactment is nothing new.

several important limiting principles for recognizing new ATS liability.

I turn to those next.

**B.**

In a quartet of cases, the Supreme Court has continually rejected attempts to expand the list of causes of action available under the ATS.

First, consider *Sosa*. After our own court attempted to expand the ATS beyond "the handful of international law *cum* common law claims understood in 1789" by recognizing a cause of action for arbitrary arrest and detention, *Sosa*, 542 U.S. at 712, the Court intervened. After meticulously surveying the history of the ATS and the "ambient law of [its] era," *id.* at 713, the Court warned that federal courts must exercise "great caution in adapting the law of nations to private rights," *id.* at 728. Reflecting this caution, the Court established a two-part test before federal courts may recognize a new cause of action under the ATS. Because the ATS was meant to "provide a cause of action for [a] modest number of international law violations," *id.* at 724, any new cause of action (1) must stem from violating "a norm that is specific, universal, and obligatory" under international law, and (2) must be a proper exercise of judicial discretion, *id.* at 732–33.

The first step must be undertaken with reference to the ATS's historical understanding. Before recognizing "any claim based on the present-day law of nations," the Court said that federal courts must ensure the claim "rest[s] on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms we have recognized."

*Id*. at 725; *see also id.* at 732 ("[F]ederal courts should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when § 1350 was enacted.").

The second step—dealing with discretion—must assess the "practical consequences" of recognizing a new cause of action. *Id*. at 732–33. To that effect, federal courts ought to consider: "legislative guidance before exercising innovative authority over substantive law," *id.* at 726; "the possible collateral consequences of making international rules privately actionable," *id.* at 727; the effect of claiming a "limit on the power of foreign governments over their own citizens," *id.*; and the "risks of adverse foreign policy consequences," *id.* at 728.

But whatever door the Court opened in *Sosa* has been steadily closing, starting with *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108 (2013). In that case, the Court rejected ATS jurisdiction over claims against a foreign corporation when "all the relevant conduct took place outside the United States." *Kiobel*, 569 U.S. at 124. The Court applied the presumption against extraterritorial application—a canon of interpretation for an Act of Congress—even though the ATS was a jurisdictional statute. *Id.* at 115–16. While the ATS does "not directly regulate conduct or afford relief," the Court said that "the principles underlying the canon of interpretation similarly constrain courts considering causes of action that may be brought under the ATS." *Id.* at 116. Indeed, the Court found it even more necessary to "constrain courts exercising their power under the ATS" because of the "danger of unwarranted judicial interference in the conduct of foreign policy." *Id.* at 116–17.

Then comes *Jesner*. There, the Supreme Court again affirmed limits on ATS liability. This time, commenting on the "unresolved" issue of corporate liability, *Jesner*, 584 U.S. at 251–52, the Court, applying *Sosa*'s two-step test, declined to permit foreign corporations to be sued under the ATS, *id.*, 584 U.S. at 272. In doing so, the Court established the primacy of separation-of-powers concerns in both steps of the *Sosa* test. *Id.* at 258. "[S]ome congressional statutes," for example, may "bear[] both on the content of the norm being asserted and the question whether courts should defer to Congress." *Id.* at 258. So if there are "sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy," then "courts must refrain from creating the remedy in order to respect the role of Congress." *Id.* at 264 (simplified). "[S]eparation-of-powers concerns," the Court said, "counsel[ed] against courts creating private rights of action . . . [particularly] in the context of the ATS." *Id.* at 264–65. Indeed, the Court even suggested that "*Sosa* would preclude courts from *ever* recognizing any new causes of action under the ATS." *Id.* at 265 (emphasis added). But it left that question for another day.

Last is *Nestlé*. Once again, our circuit tried to expand ATS liability—to domestic corporations for conduct and injuries occurring almost entirely abroad. *Nestlé*, 593 U.S. at 634. Once again, the Court stopped our overreach. *Id.* at 631. While the Court overruled us based on our failure to require "more domestic conduct than general corporate activity," *id.* at 634, Justice Thomas, joined by Justices Gorsuch and Kavanaugh, also emphasized that "courts must refrain from creating a cause of action whenever there is even a single sound reason to defer to Congress," *id.* at 635 (plurality). Those Justices reiterated that the "judicial creation of a cause of action is an extraordinary act that

places great stress on the separation of powers." *Id.* at 636 (plurality).

Under this precedent, several principles emerge. First, the judicial creation of new causes of action under the ATS is extraordinarily disfavored if not dead letter. Second, the historical understanding of the ATS is relevant in assessing whether a norm gives ground for liability under the statute. Third, some domestic law, including presumption canons, govern our interpretation of the ATS's scope. Fourth, separation-of-powers concerns almost entirely foreclose the recognition of new causes of action under the ATS.

With these principles in mind, I turn to this case.

## II.

A group of practitioners of Falun Gong have claimed that the Chinese government has violated their human rights in China. They claim that they were subject to the torts of prolonged arbitrary detention; disappearance; extrajudicial killing; forced labor; cruel, indecent, or degrading treatment; and crimes against humanity. But they have not directly sued China or Chinese officials. Instead, they brought ATS claims against Cisco Systems, a provider of IT products and services, for aiding and abetting China's international-law violations through its computer-networking hardware and software. After the district court dismissed the ATS claims, the panel majority reinstated them under the theory that aiding-and-abetting liability for any tort violating the law of nations fell within the ATS's scope. *See Doe*, 73 F.4th at 718. The majority broadly declared that because "aiding and abetting liability is a norm of customary international law with sufficient definition and universality," it can be brought in a suit under the ATS. *Id.* at 717. Judge Christen dissented, citing separation-of-powers and foreign-relations

concerns.  *Id.* at 746–51 (Christen, J., concurring in part and dissenting in part).

The panel majority made three critical mistakes.  First, it overlooked the historical scope of accomplice liability by providing blanket authorization for aiding-and-abetting liability under the ATS.  Second, it upset the separation of powers by aggrandizing our role in creating law, which the Constitution grants only to the political branches.  And third, it ignored serious foreign-policy concerns implicated by expanding aiding-and-abetting liability here.  Each of these errors is sufficient to take this case en banc.

I turn to each in order.

## A.

### Historical Aiding-and-Abetting Liability

To create new liability under the ATS, the Supreme Court has made clear that we must look to "historical antecedents."  *Sosa*, 542 U.S. at 732.  It stated, "federal courts should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the *historical paradigms* familiar when § 1350 was enacted."  *Id*. (emphasis added).  So whatever customary international law may tell us today, a comparison to "historical paradigms" within the general common law is still relevant.  On that front, it's far from clear that aiding-and-abetting liability would attach to *all* torts claiming violation of the law of nations.  *See Khulumani v. Barclay Nat. Bank Ltd*., 504 F.3d 254, 330 (2d Cir. 2007) (Korman, J., dissenting in part) (concluding that historical records "do not support the extraordinary proposition that Congress intended the [ATS] to permit jurisdiction to be exercised

over claims of aiding-and-abetting without regard to whether the conduct at issue violated an international law norm").

Rather than looking at *any* historical paradigms, the panel majority simply endorsed the supposed "consensus" among modern international-law documents to find universal accomplice liability. *Doe*, 73 F.4th at 718. Following the Second Circuit, the panel majority considered the Nuremberg tribunals, unnamed "treaties and conventions," U.N. Security Council actions, the International Criminal Tribunal for Yugoslavia, the International Criminal Tribunal for Rwanda, and the Rome Statute of the International Criminal Court. *Id*. (citing *Khulumani*, 504 F.3d at 260). All these sources, the panel majority concluded, "recognize some form of accomplice liability for violations of international law." *Id*. On that basis alone, the panel majority said aiding-and-abetting liability was "sufficiently definite and universal to be a viable form of liability under the ATS." *Id*. It then ruled that the liability was available for the seven *different* torts alleged by plaintiffs.

This analysis is incomplete. Whether aiding and abetting exists as a general matter in international law isn't the end of the inquiry. After all, aiding and abetting is not a tort by itself, but a type of liability that attaches to the commission of one. *See* Restatement of Torts § 876(b); *E. Trading Co. v. Refco, Inc*., 229 F.3d 617, 623 (7th Cir. 2000) (observing that "there is no tort of aiding and abetting," rather it is "a basis for imposing tort liability"). Since aiding and abetting doesn't exist in the abstract, the question remains: aiding and abetting *what*? *See Twitter, Inc. v. Taamneh*, 598 U.S. 471, 506 (2023) ("The point of aiding and abetting is to impose liability on those who consciously and culpably participated in the *tort at issue*.") (emphasis added). So it was incorrect

for the panel majority to skip to universal aiding-and-abetting liability without first assessing whether accomplice liability attached to the underlying conduct at issue for each tort. Indeed, when considering whether corporate liability attached, we had remarked that the "analysis proceeds norm-by-norm; there is no categorical rule of corporate immunity or liability." *Doe I v. Nestlé USA, Inc.,* 766 F.3d 1013, 1022 (9th Cir. 2014) ("*Nestlé I*"). The same norm-by-norm analysis should apply for aiding-and-abetting liability.

At the very least, to determine whether aiding-and-abetting liability applies to *every* tort in violation of international law, we should have considered historical paradigms. While *criminal* aiding and abetting is an "ancient . . . doctrine," *civil* aiding and abetting has shallow roots in our law. *Cent. Bank*, 511 U.S. at 181. *Central Bank* rejected the argument that civil aiding-and-abetting liability was widespread under domestic law. "[A]t best," the Court said, the doctrine was "uncertain in application" in tort law. *Id.* at 181–82 (observing that common-law aiding-and-abetting tort liability was not recognized in Maine, Pennsylvania, Virgnia, and Montana). Almost derisively, *Central Bank* dubbed common-law precedents on civil aiding and abetting as "isolated acts of adolescents in rural society." *Id.* at 181 (simplified). And, unlike with criminal law, "Congress has not enacted a general civil aiding and abetting statute—either for suits by the Government . . . or for suits by private parties." *Id.* at 182.

*Central Bank* thus suggests that civil aiding and abetting has no storied place in domestic law—whether it be statutory, common, or general law. So "when Congress enacts a statute under which a person may sue and recover damages from a private defendant for the defendant's violation of some statutory norm, there is no general

presumption that the plaintiff may also sue aiders and abettors." *Id*.

Given the uncertainty of its civil application, we should have done more before declaring universal aiding-and-abetting liability for all torts under international law. Indeed, consider the three primary torts accepted at the time of the ATS's enactment. While aiding-and-abetting liability was well recognized for piracy at the time of the First Congress,[3] the record is less definitive for violations of safe conducts[4]

---

[3]  For example, in response to a significant "increase[]" in piracy, in 1721, England passed a law expanding liability for "consult[ing], combin[ing], confederat[ing,] or correspond[ing] with any pirate." Piracy Act, 1721, 8 Geo. 1, c. 24 (Eng.).  In Colonial America, defendants were also tried and convicted of aiding and abetting piracy. *See, e.g.*, Case of John Rose Archer and Others, in John Franklin Jameson, Privateering and Piracy in the Colonial Period: Illustrative Documents (1923), at 323–45.  And just after passage of the ATS, Congress also made aiding and abetting piracy a crime.  Crimes Act of 1790, ch. 9, § 10, 1 Stat. 112, 114 (1790) (defining an accessory to piracy as "every person who shall . . . knowingly and wittingly aid and assist, procure, command, counsel or advise any person or persons, to do or commit any murder or robbery, or other piracy aforesaid, upon the seas").

[4]  A 1795 opinion from Attorney General William Bradford is often cited as recognizing accomplice liability for violations of safe conducts. *See* Breach of Neutrality, 1 Op. Att'y Gen. 57, 59 (1795).  In the opinion, Bradford was asked whether American citizens who "voluntarily joined, conducted, aided, and abetted a French fleet in attacking the settlement, and plundering or destroying the property of British subjects on that coast" could be subject to criminal penalties. *Id*. at 58.  Bradford doubted that criminal liability attached but suggested that "these acts of hostility have a remedy by a *civil* suit in the courts of the United States." *Id*. at 59.  This short response doesn't distinguish between principal and accomplice liability, so we don't know if he meant to encompass both. *See Khulumani*, 504 F.3d at 329–30 (Korman, J., dissenting in part).

and ambassadorial rights.[5] Without more, this mixed history signals that aiding-and-abetting liability should not apply *categorically* to all torts recognized under customary international law.

In response, the panel majority simply dismisses *Central Bank*'s analysis because, it claims, the Supreme Court case does "not govern" the ATS. *Doe*, 73 F.4th at 722. Because the ATS is a "jurisdictional statute," the panel majority believed it must rely on its view of "international law, not statutory text" to decide the "appropriate scope of liability." *Id*. But that's off base. As *Sosa* made clear, any private claims under the ATS must come from "federal common law," 542 U.S. at 732, so fashioning the scope of liability must be similarly guided by domestic law—meaning *Central Bank* controls. In other words, while international law may provide the *norms* at issue, domestic law supplies the *liability* for any violation of international norms. *See Kiobel,* 569 U.S. at 115–16 (using a canon of interpretation for federal statutes to limit the ATS's reach); *Nestlé I,* 766 F.3d at 1022 ("[I]nternational law defines norms and determines their scope, but delegates to *domestic law* the task of determining the civil consequences of any given violation of these norms.") (emphasis added); Louis Henkin, Foreign Affairs and the United States Constitution 245 (2d

---

[5] At English common law, committing an offense against an ambassador—such as by arresting, detaining, or seizing an ambassador, his servants, or his goods—was an offense punishable under the law of nations. 4 William Blackstone, Commentaries *70 (1769). The charge could be brought against "all persons prosecuting, soliciting, or executing such process." *Id*. While Blackstone mentions "soliciting," solicitation is different from aiding and abetting and, to my knowledge, such suits were not commonly filed under an accomplice theory of liability.

ed. 1996) ("International law itself, finally, does not require any particular reaction to violations of law.").

Consistent with the historical caution for recognizing civil accomplice liability, we should not have accepted so easily such sweeping aiding-and-abetting liability under the ATS.  To begin, we should have analyzed the liability available to each underlying tort under international law on a norm-by-norm basis.  And next, we should have looked to historical paradigms to see whether universal civil aiding-and-abetting liability should be part of our federal common law.  By circumventing this analysis, we skirt the cautionary roadblocks set by the Supreme Court in creating new causes of action.

## B.

## Separation of Powers

Even more troublesome here is the affront to the separation of powers.  Not too long ago, I warned:

> Contrary to common belief, the Constitution's "radical innovation" is not its various enumerated rights—as cherished and fundamental as they are.  It is the Constitution's design for the separation of powers that has become among the "most important contributions to human liberty."  Having "lived among the ruins of a system of intermingled legislative and judicial powers," our Founders sensed the "sharp necessity to separate the legislative from the judicial power."  The result is the clear division of authorities between Congress's "legislative

> powers" and the Judiciary's "judicial
> Power."

*Boule v. Egbert*, 998 F.3d 370, 373–74 (9th Cir. 2021)
(Bumatay, J., dissenting from the denial of rehearing en
banc) (simplified).   So in deciding "which branch of
government may create" new causes of action, the answer
should *always* be Congress.  *Id.*

Notwithstanding *Sosa* contemplating that federal courts
could recognize a claim based on present-day international
law, the Supreme Court has subsequently signaled that
federal courts should be reluctant to recognize federal
common law tort liability where Congress has not done
so.  *See Jesner*, 584 U.S. at 265.  That's because "creating a
cause of action is a legislative endeavor."  *Egbert v. Boule*,
596 U.S. 482, 491 (2022).  At bottom, "[t]o create a new
cause of action is to assign new private rights and
liabilities—a power that is in every meaningful sense an act
of legislation."  *Id.* at 503 (Gorsuch, J., concurring).  And as
the Court has instructed in many cases, "[i]f there is a
rational reason to think that the answer is 'Congress'—as it
will be in most every case"—then we cannot proceed with
the cause of action.  *Id.* at 492 (opinion) (simplified).

While *Egbert*'s separation-of-powers concern dealt with
*Bivens* claims, it should sound familiar by now—the Court
has repeated the same concerns for claims under the ATS in
*Sosa*, *Kiobel*, *Jesner*, and *Nestlé.  See supra* Section I.B.  The
Court's message could not be clearer: When creating causes
of action, separation-of-powers concerns predominate and
perhaps even trump all else.

So, as always, statutory text should control our analysis.
But nothing in the text of the ATS shows congressional

intent to advance aiding-and-abetting liability. *See* 28 U.S.C. § 1350. There's no language supporting judicial creation of new liability. Not a word about which standard of accomplice liability to use. While this should end our analysis, we could consider more.

First, Congress's inaction speaks volumes. The First Congress knew exactly how to codify aiding-and-abetting liability. Just one year after the passage of the ATS, it did exactly that. In the Crimes Act of 1790, Congress criminalized accomplice liability for piracy—expanding liability for any persons who "knowingly and wittingly aid and assist, procure, command, counsel or advise any person or persons, to do or commit any murder or robbery, or other piracy aforesaid, upon the seas[.]" *See* Crimes Act of 1790, ch. 9, § 10, 1 Stat. 112, 114 (1790). And "[w]hen Congress knows how to achieve a specific statutory effect, its failure to do so evinces an intent *not* to do so." *Fish v. Kobach*, 840 F.3d 710, 740 (10th Cir. 2016). We should have taken the hint and left this question for Congress. Instead, we legislated new liability when Congress did not.

Second, more recent congressional activity gives more reason to pause. In 1991, Congress expanded liability under the ATS but neglected to include accomplice liability. Congress passed the TVPA, which recognizes a cause of action for torture. *See* 28 U.S.C. § 1350 note. It did *not* prohibit aiding and abetting. *Id*. So Congress opened up the ATS and included torture. Nothing else. That Congress went no further should be dispositive. *See Nestlé*, 593 U.S. at 644 (Gorsuch, J. concurring) ("The one time Congress deemed a new ATS action worth having, it created that action *itself*[.]"). Justices have also noted the passage of the Trafficking Victims Protection Reauthorization Act of 2003 and the codification of a private right of action against

perpetrators of human-trafficking violations and slavery as reason to defer to the political branches in this field. *Id.* at 638 (plurality).

Third, recall *Central Bank*. Based on the doctrine's uncertain history in tort law and congressional inaction, the Court dismissed a "general presumption" of reading aiding-and-abetting liability into civil statutes. *Cent. Bank*, 511 U.S. at 182. The Court determined that Congress did not operate with an assumption of such liability in federal civil statutes. *Id.* Imposing accomplice liability without any textual direction would be a "vast expansion of federal law" without "any precedent," the Court said. *Id.* at 183. So *Central Bank* shows that the statute's text controls the availability of accomplice liability. *See id.* at 177, 191. And statutory silence means that there is none. *Id.* Otherwise, imputing aiding-and-abetting liability would thwart Congress's will.

Thus, courts should not be in the business of creating causes of action, especially when Congress has spoken (or not spoken) in this very field. This tells us that universal accomplice liability is not something that can be slapped haphazardly onto the ATS. As the Court warned, our "general practice" must be to look for "legislative guidance" before innovating in the law. *Sosa*, 542 U.S. at 726. Indeed, "[i]t would be remarkable to take a more aggressive role in exercising a jurisdiction" than Congress has done over two centuries. *Id.* But aggression is exactly what we have displayed here.

Despite all these reasons to pause, the panel majority pressed ahead based on a fundamental misunderstanding of the judicial role. It looked at whether the political branches regulated Cisco's particular activity. *See Doe I*, 73 F.4th

at 723.  And seeing a lack of "comprehensive and direct regulation" of Cisco's activity by Congress and the executive branch, the panel majority thought it free to judicially invent accomplice liability.  *Id*. at 723, *see also id.* at 724 ("Congress and the Executive's decision not to regulate or prohibit generally the export of computer networking software does not conflict with the recognition that U.S. corporations may be liable . . . for aiding and abetting violations of international law.").  According to the panel majority, so long as its creation of aiding-and-abetting liability doesn't "displace" or "conflict" with the political branches' existing regulatory scheme, then no separation-of-powers concern exists.  *Id.*

But this turns the separation of powers on its head.  The separation of powers means that courts don't exercise legislative authority.  Period.  Just because a judicial innovation doesn't *affirmatively* interfere with the political branches' regulatory scheme doesn't mean it comports with Article III's limits.  The point is not that political branches must completely occupy the field of regulation before we abstain from creating new causes of action.  It is that we don't belong on the field at all.  And in recognizing liability for violations of international law, that the political branches entered the field is reason enough for us to exit it.  Just because the political branches left something unregulated— such as accomplice liability—doesn't mean we may fill the void at will.  So even assuming the political branches haven't comprehensively regulated Cisco's products and services, that doesn't mean we may trade positions with our elected officials and legislate in the margins.  By failing to cabin our role, we cross into the uncomfortable territory of judicial lawmaking—an area foreign to our Constitution.

# C.

## Foreign Policy Concerns

Extending aiding-and-abetting liability here raises foreign policy concerns as obvious as they are serious. The Court has repeatedly warned of the "inherent" impact on foreign affairs when creating a cause of action under the ATS. *Jesner*, 584 U.S. at 265. The "principal objective" of the ATS was to "avoid foreign entanglements by ensuring the availability of a federal forum where the failure to provide one might cause another nation to hold the United States responsible for an injury to a foreign citizen." *Id.* at 255. So we should be especially reluctant to permit judicially manufactured causes of action that exacerbate foreign policy headaches rather than ease them. After all, the Judiciary has neither the "aptitude, facilities nor responsibility" to make foreign policy determinations. *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948).

In this case, the plaintiffs seek to hold China and its government accountable for purported violations of international law through its alleged aiders and abettors. Allowing this suit to go forward thus means that a federal court may participate in declaring that the Chinese Communist Party and Ministry of Public Security violated international law in its treatment of Falun Gong practitioners. As Judge Christen noted in dissent, "[s]uch a finding could have serious ramifications for Sino-American relations, fraught as they already are." *Cisco*, 73 F.4th at 749 (Christen, J., concurring in part and dissenting in part). So extending liability here directly risks *heightening* diplomatic strife—all the more reason we should have declined to recognize liability.

The panel majority dismissed these foreign policy concerns because, it claimed, aiding-and-abetting liability focuses on the "transgressions of nongovernmental actors" rather than "the actions of foreign governments themselves." *Cisco*, 73 F.4th at 720. But the panel majority misunderstood the nature of aiding-and-abetting liability. Such liability is a form of secondary liability, meaning that *someone else* must have committed the tortious conduct. *See* Restatement of Torts § 876(b). In this case, as plaintiffs allege, that *someone else* must be the agents of the Chinese government. So the only way for this suit to proceed is for a federal court to adjudicate the responsibility of the Chinese Communist Party—the ruling party of China—and the Ministry of Public Security—a government ministry—for violations of international law. Indeed, "a pronouncement either way on the legality of other sovereigns' actions falls within the realm of delicate foreign policy questions committed to the political branches." *Spectrum Stores, Inc. v. Citgo Petrol. Corp.,* 632 F.3d 938, 951 (5th Cir. 2011).

The panel majority's answer to the concern for our country's relationship with China was largely "so what?" According to the panel majority, the more important consideration is that the "international community" might question our failure to provide a forum to hold accountable aiders and abettors of international law violations. *Cisco*, 73 F.4th at 720–21. While that may be true, the Judiciary has zero competence to make such a decision. This "delicate [and] complex" question squarely falls within the "domain" of the political branches and should be left without "judicial intrusion." *See Chi. & S. Air Lines*, 333 U.S. at 111.

Two decades ago, in a case similarly alleging mistreatment of Falun Gong practitioners in China, the U.S. State Department weighed in on the foreign policy

implications there.  *See Doe v. Qi*, 349 F. Supp. 2d 1258
(N.D. Cal. 2004).  Referring to the ATS and TVPA claims
brought against China, the State Department equivocally
expressed that federal court adjudication of the claims "is not
the best way for the United States to advance the cause for
human rights in China." *Id.* at 1271 (quoting the 2002 State
Dep't Letter).  The State Department further urged the
district court in that case to "find[] the suits non-justiciable"
because of the "potentially serious adverse foreign policy
consequences that such litigation can generate." *Id.* at 1297.
In the letter, the State Department cautioned against the
"potential for reciprocal treatment" by Chinese officials
should the suit go forward.  2002 State Dep't Letter at 8.
While the State Department was concerned about the
treatment of U.S. officials in that case, the implications for
all U.S. citizens abroad in this case are obvious.

And the panel majority simply drew the wrong
inferences from the fact that the State Department did not
submit a letter here.  The panel majority took the State
Department's lack of affirmative action as a sign that the
"foreign affairs implications here are not comparable" to
other cases involving the Chinese government as a party.
*Doe I*, 73 F.4th at 721.  But those other cases either involved
Supreme Court cases or cases in which the court requested
the Government's input.  But here, it is "[un]realistic to
expect the Department . . . to monitor all 94 federal district
courts for any ATS litigation raising foreign policy
concerns." *Cisco*, 73 F.4th at 750 (Christen, J., concurring
in part and dissenting in part).  What's more, the panel
majority expressly declined to request the State
Department's views here.  Why?  It's rather baffling.  That
should be the *minimum* when considering creating a new
cause of action with serious foreign policy consequences.

Given all this, it is no wonder that the Government has long opposed the recognition of aiding and abetting liability under the ATS. *See* Brief for United States of America as Amici Curiae Supporting Petitioners, *Nestlé*, 593 U.S. 628 (2020) (Nos. 19-416, 19-453), 23 ("This Court should conclude—as the government has long argued—that aiding and abetting liability constitutes an improper expansion of judicial authority to fashion federal common law under the ATS." (simplified)). In particular, the Government was concerned that "[a]iding-and-abetting claims provide plaintiffs with a means for evading the limitations of sovereign immunity and challenging the policies and conduct of foreign states and officials." *Id*. at 25.

All this provides compelling reason to exercise our discretion against aiding-and-abetting liability here.

## III.

In one single decision, our circuit dismantles the crucial barrier that separates the three branches of government. We first undermine the foundation of that barrier by expanding the ATS beyond its scope and disregarding the clear action—and inaction—of the Legislature. Then we weaken this wall by ignoring the Executive's singular role over foreign-policy decisions—which we stress by permitting greater tensions with a world superpower. And finally, we diminish the respect for the Judiciary by aggrandizing our role. So just like that, the separation of powers wall comes tumbling down.

For these reasons, I respectfully dissent from the denial of rehearing en banc.