(Slip Opinion) OCTOBER TERM, 2025 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## CISCO SYSTEMS, INC., ET AL. *v.* DOE ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 24–856.  Argued April 28, 2026—Decided  June 23, 2026

Plaintiffs contend that the Chinese Government persecuted them because of their religious beliefs, and that Cisco Systems, Inc. enabled that persecution by developing surveillance technology that allowed China to identify and apprehend them.  Plaintiffs allege that Cisco and its executives are liable for aiding and abetting violations of international law, citing the Alien Tort Statute (ATS).  One plaintiff also seeks to hold two Cisco executives liable for aiding and abetting violations of the Torture Victim Protection Act of 1991 (TVPA).

The ATS grants federal district courts jurisdiction over "any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."  28 U. S. C. §1350.  The ATS lay mostly dormant for two centuries after its enactment.  In the last few decades, however, litigants have urged courts to allow private rights of action under the ATS for various alleged human rights abuses.  In *Sosa* v. *Alvarez-Machain*, 542 U. S. 692, this Court held that "the ATS is a jurisdictional statute creating no new causes of action."  *Id*., at 724.  At the same time—and in considerable tension with that point—the Court said that the ATS allows for the possibility of new, judicially created causes of action to enforce norms of international law.  *Id.,* at 724–725.  Though *Sosa* did not "close the door" on judicially created rights of action under the ATS, *Sosa* emphasized the narrowness of its view and underscored the need for "vigilant doorkeeping."  *Id*., at 729.  *Sosa* proposed a two-step framework for creating those causes of action: First, a plaintiff must show that the norm has a "definite content and acceptance among civilized nations," *id*., at 732; second, a plaintiff must show that it would be prudent for the court to create the proposed cause of action when the political branches have not acted, *id*., at 726, 736, n. 27.  Since *Sosa,* the Court has never

created an ATS right of action.

In this case, the District Court dismissed plaintiffs' complaint, but the Ninth Circuit reversed in relevant part. The Ninth Circuit focused on whether aiding-and-abetting liability may be imposed under the ATS. 73 F. 4th 700, 716. At *Sosa*'s first step, the Ninth Circuit found that "aiding and abetting liability is sufficiently definite and universal to be a viable form of liability under the ATS." 73 F.4th, at 718. At the second step, it concluded that neither "foreign relations concerns" nor "deference to Congress" supplied a "prudential reason to decline to recognize aiding or abetting liability." *Id*., at 720. The Ninth Circuit also held that the TVPA "encompasses claims against those who aid and abet torture." *Id*., at 744. The Court granted certiorari to determine whether Cisco may be held liable for aiding and abetting offenses under the ATS, and whether two of its executives may be held liable under the TVPA for aiding and abetting torture.

*Held*:

1. Courts may not create new causes of action for violations of international norms under the ATS. Pp. 7–12.

Two points drive the Court's decision. First, judicial authority under *Sosa*'s second step was "narrow at the outset." *Nestlé USA, Inc.* v. *Doe*, 593 U. S. 628, 636 (opinion of THOMAS, J.). *Sosa* instructed federal courts to exercise "great caution in adapting the law of nations to private rights," 542 U. S., at 728, and to assess the "practical consequences" of creating new liability under the ATS, including the "risks of adverse foreign policy consequences." *Id*., at 728, 732–733. Because ATS cases by their nature implicate foreign policy, it is difficult to think of a case in which a court "might safely conclude" that a new ATS cause of action would not have detrimental foreign policy consequences. *Jesner* v. *Arab Bank, PLC*, 584 U. S. 241, 284 (2018) (GORSUCH, J., concurring). Second, the power to create causes of action belongs to Congress. See, *e.g.*, *Sosa*, 542 U. S., at 727; *Nestlé*, 593 U. S., at 634–635 (opinion of THOMAS, J.). The Court has "rejected the practice of fashioning rights of action as [it] see[s] fit," *FS Credit Opportunities Corp.* v. *Saba Capital Master Fund, Ltd*., 608 U. S. ___, ___–___ (slip op., at 3–4). Congress is better positioned than courts to evaluate the policy tradeoffs of creating liability. This is especially true in an area like this one, where the Constitution expressly delegates authority to Congress to "define and punish . . . Offences against the Law of Nations." Art. I, §8, cl. 10. For that reason, creating any cause of action "is an extraordinary act that places great stress on the separation of powers." *Nestlé*, 593 U. S., at 636 (opinion of THOMAS, J.).

Because of these concerns, *Sosa* consciously designed a test that would be extremely difficult to meet. But what *Sosa* made difficult, subsequent legal developments have made impossible. Since *Sosa* was

decided, the Court has firmly committed to the view that judicially cre-
ated causes of action offend the separation of powers in almost every
circumstance.  Recent cases emphasize that "'[i]f there are sound rea-
sons to think Congress might doubt the efficacy or necessity of a dam-
ages remedy, the courts must refrain from creating it.'"  *Egbert* v.
*Boule*, 596 U. S. 482, 491 (quoting *Ziglar* v. *Abbasi*, 582 U. S. 120, 137;
alterations omitted).  In the ATS context, there will always be at least
a "single sound reason" to conclude that Congress might not want the
judiciary to take the lead.  *Sosa* itself identified one applicable in every
case: "the possible collateral consequences of making international
rules privately actionable."  542 U. S., at 727.  And Congress has cre-
ated an "alternative remedial structure"—the TVPA—which precludes
the creation of a cause of action.  *Ziglar*, 582 U. S., at 137.

The Court therefore will not continue to "indulge the fiction" that
creating new ATS causes of action is sometimes appropriate.  *Edwards*
v. *Vannoy*, 593 U. S. 255, 274.  Correcting *Sosa*'s unfulfilled prediction
will not upset reliance interests and will promote stability.  *Sosa* was
overly optimistic in its prediction that there might be a narrow class of
cases in which courts may create ATS actions without infringing on
the prerogatives of the political branches.  In truth, this class is a null
set.  And because courts cannot create new rights of action to remedy
violations of international law, there is necessarily no liability for aid-
ing and abetting such violations.

2. The TVPA, which contains an express cause of action against
someone who "subjects" another to torture, does not provide for aiding-
and-abetting liability.  Pp. 12–14.

In *Central Bank of Denver, N. A.* v. *First Interstate Bank of Denver,
N. A.*, 511 U. S. 164, the Court held that §10(b) of the Securities Ex-
change Act of 1934 does not create civil aiding-and-abetting liability
because the statute does not mention "aiding and abetting," differenti-
ating §10(b) from other civil statutes in which Congress expressly pro-
vided for that specialized form of liability.  *Id.*, at 175−177, 182−183.
The TVPA similarly nowhere mentions aiding-and-abetting liability,
and that silence is enough to settle the issue.

Plaintiffs argue that "subjects" in the TVPA is broad enough to in-
clude aiding-and-abetting liability, but it is not.  To "subject" another
to torture means "to cause to undergo or submit to," Webster's Third
New International Dictionary 2275, signaling a causal connection be-
tween torturer and victim.  Aiding-and-abetting liability, by contrast,
encompasses many forms of assistance provided by those who are one
(or more) steps removed from the torturer.  See *Twitter, Inc.* v.
*Taamneh*, 598 U. S. 471, 497.  *Central Bank* rejected a similar argu-
ment that the phrase "'directly or indirectly'" authorized aiding-and-
abetting liability, explaining that "aiding and abetting liability

extends beyond persons who engage, even indirectly, in a proscribed activity." 511 U. S., at 175−176. The same analysis applies here: Aiding-and-abetting liability sweeps more broadly than the language Congress chose.

73 F. 4th 700, reversed and remanded.

BARRETT, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, ALITO, GORSUCH, and KAVANAUGH, JJ., joined. JACKSON, J., filed an opinion concurring in part and dissenting in part, in which KAGAN, J., joined. SOTOMAYOR, J., filed a dissenting opinion, in which KAGAN and JACKSON, JJ., joined as to Parts I–III and V.

NOTICE: This opinion is subject to formal revision before publication in the
United States Reports. Readers are requested to notify the Reporter of
Decisions, Supreme Court of the United States, Washington, D. C. 20543,
pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

_____

No. 24–856

_____

## CISCO SYSTEMS, INC., ET AL., PETITIONERS *v.* DOE I, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 23, 2026]

JUSTICE BARRETT delivered the opinion of the Court.

The Alien Tort Statute grants federal courts jurisdiction to hear cases involving violations of the law of nations. While conceding that the ATS is "strictly jurisdictional," we have also said that courts have narrow authority to create causes of action under it. *Sosa* v. *Alvarez-Machain*, 542 U. S. 692, 713, 724–725 (2004). These positions are in obvious tension with one another. More significantly, however, asserting such authority would intrude on both Congress's prerogative to provide rights of action and the power of the political branches to direct the Nation's foreign policy. It is therefore unsurprising that this Court has never created an ATS action. The authority to do so, always described as slight, is more accurately described as nonexistent.

Today, we close the door that *Sosa* cracked and hold that courts may not create new causes of action for violations of international norms. We also hold that the Torture Victim Protection Act of 1991, which contains an express cause of action, does not provide for aiding-and-abetting liability.

# I

## A

In the early days of our Nation, two incidents involving foreign diplomats "caused substantial foreign-relations problems." *Jesner* v. *Arab Bank, PLC*, 584 U. S. 241, 253 (2018). The French Minister Plenipotentiary complained to the Continental Congress and threatened to leave the country after the Secretary of the French Legation was assaulted in Philadelphia. See *Kiobel* v. *Royal Dutch Petroleum Co.*, 569 U. S. 108, 120 (2013). And a New York constable caused an "international incident" a few years later when he entered the house of the Dutch Ambassador to arrest one of his servants. *Jesner*, 584 U. S., at 253.

At the time, the Articles of Confederation did not provide a federal forum to redress injuries like these. True, the wronged foreign officials could resort to state court. But Secretary of Foreign Affairs John Jay cautioned that "the Federal Government does not appear . . . to be vested with any judicial powers competent to the cognizance and judgment of such cases." 3 Dept. of State, The Diplomatic Correspondence of the United States of America 446 (1837). Other leading figures were similarly troubled that the Articles failed to "provi[de] for the case of offenses against the law of nations" and "consequently le[ft] it in the power of any indiscreet member to embroil the Confederacy with foreign nations." The Federalist No. 42, p. 265 (C. Rossiter ed. 1961) (J. Madison).

The new Constitution equipped the Federal Government to deal with this problem. Article III extends the judicial power to "all Cases affecting Ambassadors, other public ministers and Consuls," and "to Controversies . . . between a State, or the Citizens thereof, and foreign States, Citizens or Subjects." §2. The First Congress implemented these provisions through the Judiciary Act of 1789, which established lower federal courts and granted them jurisdiction to hear suits implicating foreign affairs. See, *e.g.*, §9, 1

Stat. 77 (admiralty and maritime jurisdiction); *ibid.* (jurisdiction over "suits against consuls or vice-consuls"); §11, *id.*, at 78 (jurisdiction over suits where "an alien is a party"). The Act also included what is now known as the Alien Tort Statute. §9, *id.*, at 77. The ATS grants federal district courts jurisdiction over "any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U. S. C. §1350.

The ATS lay mostly dormant after its enactment. Litigants only occasionally invoked its jurisdictional grant. See *Bolchos* v. *Darrel*, 3 F. Cas. 810 (No. 1,607) (SC 1795) (seizure of slaves from a captured ship); *Moxon* v. *The Fanny*, 17 F. Cas. 942 (No. 9,895) (Pa. 1793) (seizure of a brig and cargo by French privateers). And in time, another statute authorized federal courts to hear claims arising under treaties. See Act of Mar. 3, 1875, §1, 18 Stat. 470, as amended, 28 U. S. C. §1331. So for almost 200 years, the ATS did virtually no work.

That changed in 1980. In *Filartiga* v. *Pena-Irala*, 630 F. 2d 876, the Second Circuit permitted an ATS suit by foreign plaintiffs against a foreign offender for engaging in torture in violation of international law. The court identified no express cause of action; instead, it held that the ATS "open[s] the federal courts for adjudication of the rights already recognized by international law." *Id.*, at 887. Taking note, other plaintiffs urged courts to allow private rights of action under the ATS for various alleged human rights abuses. See, *e.g.*, *Tel-Oren* v. *Libyan Arab Republic*, 726 F. 2d 774 (CADC 1984) (*per curiam*); *Kadic* v. *Karadžić*, 70 F. 3d 232 (CA2 1995); *Beanal* v. *Freeport-McMoran, Inc.*, 197 F. 3d 161 (CA5 1999); *In re Estate of Marcos, Human Rights Litigation*, 25 F. 3d 1467 (CA9 1994); *Abebe-Jira* v. *Negewo*, 72 F. 3d 844 (CA11 1996).

While the Courts of Appeals wrestled with novel ATS suits, Congress enacted a related cause of action. The Torture Victim Protection Act of 1991 allows certain victims

who are tortured or killed to recover damages against the perpetrators. 106 Stat. 73, note following 28 U. S. C. §1350. But because many human rights abuses fall outside the TVPA, plaintiffs continued pressing courts to fashion rights of action under the ATS.

Over a decade later, this Court interpreted the ATS for the first time. In *Sosa* v. *Alvarez-Machain*, we held that the ATS does not permit a court to create a cause of action for arbitrary detention in violation of international law. 542 U. S., at 699, 736–738. In so holding, we stressed that "the ATS is a jurisdictional statute creating no new causes of action." *Id*., at 724. At the same time—and in considerable tension with the first point—we said that the ATS allows for the possibility of new, judicially created causes of action to enforce norms of international law. *Id*., at 724–725.

To justify this conclusion, *Sosa* reasoned that the First Congress would not have expected the ATS to "l[ie] fallow" until Congress or state legislatures enacted causes of action for violations of the law of nations. *Id*., at 719. Law-of-nations offenses formed part of "the ambient law of the era," and some "were understood to be within the common law." *Id*., at 714, 720. William Blackstone's legal treatise discussed three: "violation of safe conducts, infringement of the rights of ambassadors, and piracy." *Id*., at 715 (citing 4 Commentaries on the Laws of England 68 (1769)). Given this history, *Sosa* "assume[d] that the First Congress understood that the district courts would recognize private causes of action for certain torts in violation of the law of nations." 542 U. S., at 724. But *Sosa* "found no basis to suspect Congress had any examples in mind beyond those torts corresponding to Blackstone's three primary offenses." *Ibid*. And it acknowledged that when the ATS was enacted, no one would have understood the statute as a grant of authority to create causes of action. *Id*., at 725–726. Nonetheless, *Sosa* asserted that courts have very modest

authority to create causes of action under the ATS for violations of international norms. *Id.*, at 724–725.

Recognizing the tension between this interpretation of the ATS and the limits of the judicial role, *Sosa* emphasized the narrowness of its view. Though it did not "close the door" to "independent judicial recognition of actionable international norms," it underscored the need for "vigilant doorkeeping." *Id.*, at 729. To that end, *Sosa* proposed a two-step framework. First, a plaintiff must show that the norm has a "definite content and acceptance among civilized nations." *Id.*, at 732. (This was an effort to head off judicial creativity with respect to the norms themselves.) Second, a plaintiff must show that it would be prudent for the court to create the proposed cause of action when the political branches have not acted. *Id.*, at 726, 736, n. 27; *Jesner*, 584 U. S., at 257–258 (plurality opinion). (This was a warning that courts must tread lightly, because creating rights of action is Congress's prerogative, and foreign policy is the political branches' domain.) In *Sosa*, the plaintiff's claim failed at the first step, so the Court had no occasion to proceed to the second. 542 U. S., at 736–738.

Since *Sosa*, we have repeatedly turned away plaintiffs asserting claims under the ATS. In *Kiobel* v. *Royal Dutch Petroleum Co.*, we held that any ATS claims are subject to the presumption against extraterritoriality; thus, those "seeking relief for violations of the law of nations occurring outside the United States" are "barred." 569 U. S., at 124. We reiterated that point in *Nestlé USA, Inc.* v. *Doe*, holding that "allegations of general corporate activity . . . cannot alone establish domestic application of the ATS." 593 U. S. 628, 634 (2021). And in *Jesner* v. *Arab Bank, PLC*, we refused to impose ATS liability on foreign corporations. 584 U. S., at 272.

B

Plaintiffs in today's case are practitioners of Falun Gong, a religious movement that originated in China in the 1990s. They contend that the Chinese Government persecuted them because of their religious beliefs, and that Cisco Systems, Inc. enabled that persecution by developing surveillance technology that allowed China to identify and apprehend them. By engaging in this conduct, plaintiffs say, Cisco and its executives aided and abetted violations of international law—namely, torture; cruel, inhuman, or degrading treatment; forced labor; prolonged and arbitrary detention; crimes against humanity; extrajudicial killing; and forced disappearance. One plaintiff also seeks to hold two Cisco executives liable under the TVPA for aiding and abetting torture.

After the District Court dismissed plaintiffs' complaint, 66 F. Supp. 3d 1239, 1247 (ND Cal. 2014), the Ninth Circuit reversed in relevant part, 73 F. 4th 700, 746 (2023). It did not decide whether the underlying violations of international law satisfied *Sosa*'s test. 73 F. 4th, at 716. Instead, it analyzed only whether aiding-and-abetting liability may be imposed under the ATS. *Ibid.* At *Sosa*'s first step, the Ninth Circuit found that "aiding and abetting liability is sufficiently definite and universal to be a viable form of liability under the ATS." 73 F. 4th, at 718. And at the second step, it concluded that neither "foreign relations concerns" nor "deference to Congress" supplied a "prudential reason to decline to recognize aiding or abetting liability." *Id.*, at 720. The Ninth Circuit also held that the TVPA "encompasses claims against those who aid and abet torture or extrajudicial killing." *Id.*, at 744.

Judge Christen dissented in part. She saw "several sound reasons to decline to recognize a cause of action for aiding and abetting" the alleged acts. *Id.*, at 748. Notably, she reasoned that "a finding of liability in this case would necessarily require a showing that the Chinese Communist

Party and Ministry of Public Security violated international law." *Ibid.* And such a finding "could have serious ramifications" for U. S.-China relations, "fraught as they already are." *Id.*, at 749. Permitting aiding-and-abetting liability under the ATS is thus "inconsistent with [the court's] obligation to exercise 'great caution in adapting the law of nations to private rights.'" *Id.*, at 751 (quoting *Sosa*, 542 U. S., at 728).

Six judges dissented from the denial of rehearing en banc. They reasoned that ATS liability should be restricted "to causes of action comparable to historically recognized torts." 113 F. 4th 1230, 1237 (CA9 2024) (opinion of Bumatay, J.). That is so because creating any additional liability under the ATS violates the separation of powers. *Id.*, at 1245–1247. And the dissenting judges would exercise greater caution before "intrud[ing] in the delicate relations with another world superpower." *Id.*, at 1237, 1247–1248.

We granted certiorari to determine whether Cisco may be held liable for aiding and abetting offenses under the ATS, as well as whether two of its executives may be held liable under the TVPA for aiding and abetting torture. 607 U. S. 1120 (2026).

## II

Our starting point is *Sosa*'s key insight: The ATS "is a jurisdictional statute creating no new causes of action." 542 U. S., at 724. Put differently, "[a]s enacted in 1789, the ATS gave the district courts 'cognizance' of certain causes of action," which "bespoke a grant of jurisdiction, not power to mold substantive law." *Id.*, at 713.

Justice Scalia would have stopped there. *Id.*, at 743–744 (opinion concurring in part and concurring in judgment). He cited "[t]he general rule" that "'grants of jurisdiction alone . . . are not themselves grants of lawmaking authority'" and noted that *Sosa* had not identified any reason why the ATS is an exception. *Ibid.* He then observed that *Sosa*'s

"reasons why courts must be circumspect" in developing law under the ATS are actually "reasons why courts cannot possibly be thought to have been given" this power in the first place. *Id*., at 747.

These criticisms resonated, and since then, various Members of the Court have thoughtfully explained the problems with *Sosa*'s openness—no matter how limited—to judicially created causes of action under the ATS. See *Jesner*, 584 U. S., at 274 (THOMAS, J., concurring); *id*., at 280–293 (GORSUCH, J., concurring in part and concurring in judgment); *Nestlé*, 593 U. S., at 634–640 (opinion of THOMAS, J., joined by GORSUCH and KAVANAUGH, JJ.); see also *id*., at 658 (ALITO, J., dissenting) (noting the "strong arguments that federal courts should never recognize new claims under the ATS"). These opinions highlight the great difficulty of satisfying *Sosa*'s second step under our modern separation-of-powers precedent.

Two points drive our decision today. First, judicial authority under *Sosa*'s second step was "narrow at the outset." *Nestlé*, 593 U. S., at 636 (opinion of THOMAS, J.). Indeed, *Sosa* instructed federal courts to exercise "great caution in adapting the law of nations to private rights." 542 U. S., at 728. Before doing so, courts must assess the "practical consequences" of creating new liability under the ATS, including the "risks of adverse foreign policy consequences." *Id*., at 728, 732–733.

But ATS cases by their nature implicate foreign policy. As we have explained, "the danger of unwarranted judicial interference in the conduct of foreign policy is magnified in th[is] context." *Kiobel*, 569 U. S., at 116. After all, the "point of [a new ATS cause of action is] to vindicate 'a norm of international character.'" *Jesner*, 584 U. S., at 284 (GORSUCH, J., concurring) (quoting *Sosa*, 542 U. S., at 725). It is thus difficult to think of a case in which a court "might safely conclude" that a new ATS cause of action would not have detrimental foreign policy consequences. *Jesner*, 584

U. S., at 284 (GORSUCH, J., concurring). Even suits against American defendants (like this one against Cisco) generally require a court to examine allegations of heinous acts committed by foreign nations or individuals.[1]

The second point is that the power to create causes of action belongs to Congress. See, *e.g.*, *Sosa*, 542 U. S., at 727; *Nestlé*, 593 U. S., at 634–635 (opinion of THOMAS, J.). For this reason, *Sosa* cautioned that the "decision to create a private right of action is one better left to legislative judgment in the great majority of cases." 542 U. S., at 727.

This understates the point. While our cases at one time permitted courts to provide redress if Congress remained silent, see, *e.g.*, *J. I. Case Co.* v. *Borak*, 377 U. S. 426, 433 (1964), "we have since rejected the practice of fashioning rights of action as we see fit," *FS Credit Opportunities Corp.* v. *Saba Capital Master Fund, Ltd.*, 608 U. S. \_\_\_, \_\_\_–\_\_\_ (2026) (slip op., at 3–4). That is so because "[h]ome-grown causes of action are difficult to reconcile with 'the Constitution's separation of legislative and judicial power.'" *Id.*, at \_\_\_ (slip op., at 4) (quoting *Egbert* v. *Boule*, 596 U. S. 482, 491 (2022)); see also *Ziglar* v. *Abbasi*, 582 U. S. 120, 133 (2017). Congress is better positioned than courts to evaluate the policy tradeoffs of creating liability. See *Nestlé*, 593 U. S., at 638–639 (opinion of THOMAS, J.). This is especially true in an area like this one, where the Constitution expressly delegates authority to Congress. Art. I, §8, cl. 10 (Congress may "define and punish . . . Offences against the Law of Nations"). For that reason, creating any cause of action "is an extraordinary act that places great stress on

---

[1] The dissent is confident about the ability of federal courts to "improve foreign relations" and make judgments that are "'consonant with U. S. foreign policy interests.'" *Post*, at 16 (opinion of SOTOMAYOR, J.). The Constitution's allocation of power, however, requires greater judicial humility.

the separation of powers." *Nestlé*, 593 U. S., at 636 (opinion of THOMAS, J.).

*Sosa* acknowledged both these points: that crafting new causes of action under the ATS "raise[s] risks of adverse foreign policy consequences," 542 U. S., at 728, and intrudes on Congress's prerogative to create private rights of action, *id.*, at 727. Because of these concerns, it consciously designed a test that would be extremely difficult to meet. But what *Sosa* made difficult, subsequent legal developments have made impossible.

Since *Sosa* was decided, we have firmly committed to the view that judicially created causes of action offend the separation of powers in almost every circumstance. As a result, we have virtually eliminated the practice of fashioning them. Our cases have emphasized that "'[i]f there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy, the courts must refrain from creating it.'" *Egbert*, 596 U. S., at 491 (quoting *Ziglar*, 582 U. S., at 137; alterations omitted); *Jesner*, 584 U. S., at 264 (quoting this language). Indeed, "'[e]ven a *single* sound reason to defer to Congress is enough.'" *Egbert*, 596 U. S., at 491 (quoting *Nestlé*, 593 U. S., at 635 (opinion of THOMAS, J.); emphasis added). In the ATS context, there will always be at least a "single sound reason" to conclude that Congress might not want the judiciary to take the lead. *Sosa* itself identified one applicable in every case: "the possible collateral consequences of making international rules privately actionable." 542 U. S., at 727. For *Sosa*, this was reason "for judicial caution." *Ibid.* Under our current precedent, it is reason not to proceed at all. Cf. *Kimble* v. *Marvel Entertainment, LLC*, 576 U. S. 446, 458 (2015) ("'growth of judicial doctrine'" is a relevant consideration when reconsidering a prior case).

Though one is enough, there is another "sound reason" staying the judiciary's hand. Our post-*Sosa* cases have stressed that if Congress has created "an alternative

remedial structure," then "*that alone*" precludes the creation of a cause of action. *Ziglar*, 582 U. S., at 137 (emphasis added); see also *Egbert*, 596 U. S., at 493. Such a structure exists here: the TVPA, which creates an express cause of action under the ATS. *Sosa* acknowledged that Congress had limited the TVPA "to specific subject matter" and had taken no subsequent action to expand the covered conduct. 542 U. S., at 728. Again, for *Sosa*, this was reason to slow down, *ibid.*; under our current precedent, it is reason to stop.

Beyond changes in the law, it is hard to see how correcting *Sosa*'s unfulfilled prediction would upset reliance interests. Any such interests would belong to future plaintiffs—who surely are not relying on the remote possibility that U. S. courts would create an ATS action if they were someday injured and sought one. As for stability, today's decision promotes rather than undermines it. We have never—not once—created an ATS cause of action. Cf. *Edwards* v. *Vannoy*, 593 U. S. 255, 274 (2021) ("No one can reasonably rely on a supposed exception that has never operated in practice"). And given the "high bar" that *Sosa* set, 542 U. S., at 727, it is a stretch to believe that we ever would have. We thus see no need to "indulge the fiction" that creating new ATS causes of action is sometimes appropriate. *Edwards*, 593 U. S., at 274. Doing so would "mislea[d] litigants" by suggesting that recovery might be available while "needlessly expend[ing] . . . scarce [judicial] resources." *Id.*, at 275.[2]

---

[2] While few plaintiffs have successfully litigated ATS suits to final judgment, many more have sued and obtained large settlements. See C. Ewell, O. Hathaway, & E. Nohle, Has the Alien Tort Statute Made a Difference?: A Historical, Empirical, and Normative Assessment, 107 Cornell L. Rev. 1205, 1251–1252, 1278 (2022) (discussing ATS settlements, some of which resulted in "multimillion-dollar payments to plaintiffs"). Shutting off the possibility of additional ATS liability thus also provides clarity to defendants.

In sum, we close the door that *Sosa* cracked to judicially created ATS liability. We do not disturb *Sosa*'s holding that the ATS is a jurisdictional statute; nor do we revisit its assumption that causes of action are available for torts corresponding to the Blackstone three.[3] We conclude only that *Sosa* was overly optimistic in its prediction that there might be a narrow class of cases in which courts may create ATS actions without infringing on the prerogatives of the political branches. In truth, this class is a null set.

What result for this case? Cisco argues that the Ninth Circuit erred in holding that aiding-and-abetting liability exists under the ATS for the torts alleged by the plaintiffs. Cisco is correct. Courts cannot create new rights of action to remedy violations of international law, so there is necessarily no liability for aiding and abetting such violations. Plaintiffs' ATS claims against Cisco must be dismissed.

## III

One of the plaintiffs also sued two Cisco executives under the TVPA for aiding and abetting torture. Recall that the TVPA provides a cause of action against someone who

─────────

[3] The dissent recruits the Blackstone three as support for judicial power to create ATS actions. If the Blackstone three, the dissent asks, then why not more? *Post*, at 12. The Blackstone three do not give the dissent what it is looking for, because *Sosa* did not invoke them as evidence that the ATS originally granted courts the authority to *create* causes of action. Under the prevailing jurisprudence of the time, *Sosa* said, such torts were understood to be "found or discovered" by courts rather than "made or created." 542 U. S., at 725. Offering examples, *Sosa* stated that offenses against ambassadors "appea[r] to have been" at top of mind, violations of safe conduct "were probably understood to be actionable," and "individual actions arising out of prize captures and piracy may well have also been contemplated." *Id.*, at 720. Those are the only ATS actions this Court has ever specifically mentioned, and to the extent there has been reliance on the availability of those three actions, we see no need to revisit them. But while we say "this far and no further," the dissent would go very far indeed. In the name of honoring the expectations of the First Congress, it would leverage the Blackstone three to justify power that would have confounded the First Congress.

"subjects" another to torture. 106 Stat. 73, note following 28 U. S. C. §1350.

In *Central Bank of Denver, N. A.* v. *First Interstate Bank of Denver, N. A.*, 511 U. S. 164 (1994), we held that §10(b) of the Securities Exchange Act of 1934 does not create civil aiding-and-abetting liability. Our analysis was straightforward: Section 10(b) "'does not in terms mention aiding and abetting.'" *Id.*, at 175. That fact differentiates it from other civil statutes in which Congress expressly provided for that specialized form of liability. *Id.*, at 176−177, 182−183 (collecting statutes). Because Congress "'ha[s] little trouble'" imposing aiding-and-abetting liability "'expressly,'" its omission of the phrase in §10(b) was dispositive. *Id.*, at 177 (quoting *Blue Chip Stamps* v. *Manor Drug Stores*, 421 U. S. 723, 734 (1975)).

Just so here. The TVPA nowhere mentions aiding-and-abetting liability, and that silence is enough to settle the issue. As then-Judge Kavanaugh put it, *Central Bank* makes it "crystal clear" that no aiding-and-abetting liability exists under the TVPA because Congress has not expressly provided for it. *Doe* v. *Exxon Mobil Corp.*, 654 F. 3d 11, 87 (CADC 2011) (dissenting opinion). We agree.

Plaintiffs counter that "subjects" is broad enough to include aiding-and-abetting liability. It is not. To "subject" another to torture means "to cause to undergo or submit to." Webster's Third New International Dictionary 2275 (1993); see also American Heritage Dictionary 1788 (3d ed. 1992) ("[t]o cause to experience"). The term thus signals a causal connection between torturer and victim. Aiding-and-abetting liability, by contrast, encompasses many forms of assistance provided by those who are one (or more) steps removed from the torturer. See *Twitter, Inc.* v. *Taamneh*, 598 U. S. 471, 497 (2023) (disclaiming a "strict nexus" requirement). *Central Bank* rejected a similar argument—that the phrase "'directly or indirectly'" in §10(b) authorized aiding-and-abetting liability. 511 U. S., at 175−176. The "basic

flaw" in that interpretation "is that aiding and abetting li-
ability extends beyond persons who engage, even indirectly,
in a proscribed activity." *Id.*, at 176. After all, it encom-
passes those "who do not engage in the proscribed activities
at all, but who give a degree of aid to those who do." *Ibid.*
The "basic flaw" we identified in *Central Bank* exists here
too: Aiding-and-abetting liability sweeps more broadly than
the language Congress chose.[4]

\*　　\*　　\*

We recognize, as does the dissent, *post*, at 23–24, that
ATS and TVPA cases frequently involve heinous and inhu-
mane acts. The political branches or other international ac-
tors may well provide redress. But we decline to distort the
statutory text or the Constitution's allocation of powers to
enlist U. S. courts in that project. The judgment of the
Court of Appeals is reversed, and the case is remanded for
further proceedings consistent with this opinion.

*It is so ordered.*

————————

[4] We have noted that the TVPA "contemplates liability" against those
"who do not personally execute the torture"—in particular, those who
"giv[e] an order to torture." *Mohamad* v. *Palestinian Authority*, 566 U. S.
449, 458 (2012); see also *post*, at 25 (opinion of SOTOMAYOR, J.) (relying
on this assertion). Such liability, however, is much more limited than
aiding-and-abetting liability.

# SUPREME COURT OF THE UNITED STATES

———————

No. 24–856

———————

## CISCO SYSTEMS, INC., ET AL., PETITIONERS *v.* DOE I, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 23, 2026]

JUSTICE JACKSON, with whom JUSTICE KAGAN joins, concurring in judgment in part and dissenting in part.

I agree with JUSTICE SOTOMAYOR's discussion of the Alien Tort Statute. See *post,* at 5–10 (dissenting opinion). But I think the Court is correct to conclude that the Torture Victim Protection Act of 1991 (TVPA) does not encompass aiding-and-abetting liability. I write separately because, while my textual analysis of the TVPA tracks the majority's, see *ante,* at 12–14, I do not agree with how the majority deploys *Central Bank of Denver, N. A.* v. *First Interstate Bank of Denver, N. A.*, 511 U. S. 164 (1994), here.

*Central Bank* is relevant insofar as it instructs that "there is no general presumption" that a statute imposes aiding-and-abetting liability; rather, Congress must provide it. *Id.*, at 182. And here, Congress's use of the term "subjects" does not do so. But, as JUSTICE SOTOMAYOR discusses, *post*, at 26–27, the majority is wrong to treat *Central Bank* as creating a "magic words" test for aiding-and-abetting liability generally. Contra, *ante,* at 10–11; see *Soto* v. *United States*, 605 U. S. 360, 373 (2025) ("[W]e have so often denounced" a "'magic words' test"). Instead, the absence of the words "aid" and "abet" in the statute we interpreted in *Central Bank* was but one consideration of many. See 511 U. S., at 176–180. I therefore concur only in the judgment as to the majority's TVPA holding.

# SUPREME COURT OF THE UNITED STATES

———

No. 24–856

———

## CISCO SYSTEMS, INC., ET AL., PETITIONERS *v.* DOE I, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 23, 2026]

JUSTICE SOTOMAYOR, with whom JUSTICE KAGAN and JUSTICE JACKSON join as to Parts I, II, III, and V, dissenting.

Petitioner Cisco Systems, Inc., allegedly knowingly designed and intentionally built a mass-surveillance system for the Chinese Communist Party to use to identify, track, arrest, and torture thousands of religious minorities. As all agree, if respondents' allegations were to be proved true, then that would mean Cisco violated universally recognized norms of international law. Respondents thus sued Cisco in a federal action under the Alien Tort Statute (ATS), which vests jurisdiction in district courts over "any civil action by an alien for a tort only, committed in violation of the law of nations," 28 U. S. C. §1350. In *Sosa* v. *Alvarez-Machain*, 542 U. S. 692 (2004), this Court held that the ATS permits federal courts to find implied causes of action authorizing plaintiffs to sue defendants who violated international law.

The Court nonetheless closes the courthouse doors not just to respondents, but to virtually every future litigant seeking redress for a violation of international law under the ATS. It thus overrules *Sosa*, without even acknowledging that it is doing so. Today's decision marks yet another low point in this Court's esteem for its precedents.

Further, the Court also errs by ignoring the plain meaning of the Torture Victim Protection Act of 1991 (TVPA) and slamming the door completely shut to claims by U. S. citizens against those who aid and abet torture.

I respectfully dissent from both of the Court's holdings.

## I

## A

The following factual allegations are drawn from respondents' amended complaint and are assumed to be true because this appeal arises from the grant of a motion to dismiss. *Ashcroft* v. *al-Kidd*, 563 U. S. 731, 734 (2011).

Respondents are members of Falun Gong, a Chinese spiritual movement. Falun Gong members believe in the three core tenets of "Truthfulness, Compassion, and Tolerance." App. 2. Many of its members have vocally opposed the Chinese Communist Party (CCP).

In 1999, the CCP designated Falun Gong organizations as illegal and called for violent political crackdowns against them. During these "violent struggle" campaigns (or "*douzheng*"), CCP and Chinese Government officials subjected Falun Gong targets to brutal human-rights abuses, including torture, arbitrary detention, and reeducation through labor. *Id.*, at 12; see 73 F. 4th 700, 712 (CA9 2023) (detailing "beatings with steel rods[,] . . . shocking with electronic batons, sleep deprivation, . . . violent force-feeding," and more). The United States State Department estimates that hundreds of thousands of Falun Gong believers have been persecuted, and media sources report that thousands have been tortured to death.

To target Falun Gong members, the CCP determined that it needed to develop a sophisticated, nationwide internet-surveillance tool to track Falun Gong activity online. It thus devised the anti-Falun Gong "'Golden Shield'": a "'vast and multi-tiered'" bespoke "'surveillance system'" that the CCP contemplated would obtain and organize all

manner of data on the Falun Gong members across China, including address information, internet history, and financial and family information. *Id.*, at 710. At the time the CCP came up with the idea, however, Chinese engineers lacked the technical expertise to create such technology. As a result, the CCP turned to American technology companies and invited them to submit proposals to design its Golden Shield system.

Petitioner Cisco answered the CCP's call with an aggressive campaign to secure the Golden Shield contract. Cisco's CEO (and other senior executives) personally met with China's President and other officials to discuss and "explicit[ly] support" "the Golden Shield's *douzheng* objectives and goals." App. 62. Internal files reveal Cisco's "pledge to satisfy the repressive anti-Falun Gong purposes of the" program, while characterizing Falun Gong and its members as "'viruses,'" "'despicable,'" and an "'evil cul[t]'"—all mirroring CCP propaganda denigrating Falun Gong members as "subhuman." *Id.*, at 20–21. Cisco's public Chinese marketing materials also described the company's "promis[e] to tailor the apparatus" to meet the CCP's objectives, including "the *douzheng* of" Falun Gong. *Id.*, at 22–23; see 73 F. 4th, at 710 (describing Cisco brochures offered at Chinese trade shows marketing its services "as useful to the '*douzheng*' of Falun Gong").

Cisco's push succeeded. In 2001, the CCP selected Cisco to submit designs for the Golden Shield and later awarded it contracts to develop the program. Cisco, using engineers working from the United States, then created a massive surveillance system that "'analyzed patterns of Falun Gong Internet activity to enable the intelligent identification of individual Falun Gong Internet users,'" while providing "'real time monitoring'" of "'Falun Gong Internet traffic patterns'" and sharing the results with the CCP to "facilitate the . . . forced conversion through torture'" of Falun Gong members. *Id.*, at 711. Over time, Cisco engineers in

San Jose, California continued to provide support while also upgrading and expanding the system. For example, Cisco later created a video-surveillance system that, combined with facial-recognition technology, has become a "'primary means' of identifying Falun Gong practitioners through non-internet activities, such as protests or religious practice." *Ibid.*

Armed with the vast suite of technological tools Cisco provided, the CCP identified, arrested, and tortured thousands of Falun Gong members. *Id.*, at 712.

## B

Respondents in this case are among those victims or are family members of those who have disappeared and are suspected or confirmed dead. They allege that the CCP used information collected and stored by the Golden Shield program in forced-conversion sessions to which they were subjected. For example, on top of prolonged isolation and physical torture, Chinese officials leveraged information about some of respondents' family members (and employed threats against those family members) to coerce respondents into renouncing their religious beliefs.

In 2011, respondents filed this action against Cisco and two of its executives, suing under the ATS and alleging that Cisco aided and abetted seven international-law violations: torture; cruel, inhuman, or degrading treatment; forced labor; prolonged and arbitrary detention; crimes against humanity; extrajudicial killing; and forced disappearance. One of the respondents, who is a U. S. citizen, also brought a claim alleging that two individual defendants aided and abetted his torture in violation of the TVPA.

After the District Court dismissed the action, the Ninth Circuit reversed, holding that aiding-and-abetting liability was available under both the ATS and the TVPA. *Id.*, at

709. This Court then agreed to review the Ninth Circuit's judgment. 607 U. S. 1120 (2026).[1]

## II

A straightforward application of this Court's settled case law should have allowed respondents' ATS claims against Cisco to proceed.

### A

The ATS, enacted in 1789, permits foreign nationals harmed by violations of international law to obtain compensation for their injuries in U. S. court. See 28 U. S. C. §1350 ("The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States"). The statute is limited: As this Court explained in *Sosa* v. *Alvarez-Machain*, 542 U. S. 692, the ATS "is in terms only jurisdictional," meaning that it gives courts authority to entertain suits but does not itself create any causes of action that permit plaintiffs to sue someone. *Id.*, at 712. Even so, consulting the historical context surrounding the ATS's passage, the Court determined that Congress "intended" for the ATS "to have practical effect the moment it became law." *Id.*, at 724. Consistent with that understanding, *Sosa* held that, although federal courts should be "restrained" in doing so, they may find implied private causes of action under the ATS "for violations of any international law norm" comparable to "the historical paradigms familiar when [the ATS] was enacted." *Id.*, at 725, 732. Those paradigms include three international-law offenses that were well established when the ATS was enacted: "violation of safe conducts, infringement of the rights of ambassadors, and

---

[1] Petitioners did not allege a split among the Circuits over whether aiding-and-abetting liability is available under either statute. See Pet. for Cert. 14–24, 29–33.

piracy." *Id.*, at 715. As all agree, the ATS allows implied private rights of action for at least these three offenses.

To invoke an additional implied cause of action under the ATS, *Sosa* explained, the plaintiff must identify a norm of international law that has sufficiently "definite content" that has gained "acceptance among civilized nations." *Id.*, at 732. As part of that inquiry, courts must also make a "judgment about the practical consequences of making that cause available to litigants in the federal courts." *Id.*, at 732–733. Applying this test, the Court rejected the arbitrary-detention claim that had been raised there. The plaintiff had not alleged a sufficiently definite norm of international law. Recognizing the plaintiff's proposed cause of action would also have "breathtaking" consequences by permitting "a cause of action in federal court for any arrest, anywhere in the world," so long as it is "unauthorized by the law of the jurisdiction in which it took place." *Id.*, at 736. The Court thus declined to allow a new cause of action under the ATS. *Ibid.*

"In the years since, this Court has read *Sosa* to announce a two-step test for recognizing the availability of a cause of action under the ATS." *Nestlé USA, Inc.* v. *Doe*, 593 U. S. 628, 648 (2021) (SOTOMAYOR, J., concurring in part and concurring in judgment). At step one, courts ask "'whether a plaintiff can demonstrate that the alleged violation is "of a norm that is specific, universal, and obligatory."'" *Ibid.* If the plaintiff makes that required showing, then the court must determine "'whether allowing [a] case to proceed under the ATS is a proper exercise of judicial discretion.'" *Ibid.* That discretionary inquiry must account for "the potential implications for the foreign relations of the United States of recognizing such causes [of action]," as courts must be "particularly wary of impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs." *Sosa*, 542 U. S., at 727.

B

This case succeeds at each of *Sosa*'s steps. At step one, there is no dispute. Respondents allege that Cisco aided and abetted the violation of seven international-law norms: torture; cruel, inhuman, or degrading treatment; forced labor; prolonged and arbitrary detention; crimes against humanity; extrajudicial killing; and forced disappearance. See 73 F. 4th, at 713. Before this Court, Cisco does not make any arguments at all at step one. See Brief for Petitioners 17. It does not dispute that all seven norms are specific, universal, and obligatory, as required by *Sosa*. Nor does it dispute that international law recognizes aiding-and-abetting liability, either in general or as a substantive part of each of these seven norms.

Cisco, joined by the United States as *amicus curiae*, instead exclusively focuses on *Sosa*'s second step, at which courts ask "'if there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy.'" *Jesner* v. *Arab Bank, PLC*, 584 U. S. 241, 264 (2018). Both fail to demonstrate that it would be improper to allow this case to proceed.

First, Cisco and the United States argue that an aiding-and-abetting theory of liability can never satisfy *Sosa*'s second step because such liability will always endanger foreign-policy concerns. Those concerns, however, are best addressed on a case-by-case basis, rather than a categorical one. See *Sosa*, 542 U. S., at 733, n. 21 (discussing possibility of "case-specific deference to the political branches").

This case disproves the idea that recognizing aiding-and-abetting liability will necessarily impair U. S. foreign-policy interests. The political branches have already consistently condemned China's treatment of Falun Gong members. The Solicitor General confirmed in this very case that "the United States [has] long condemned China's treatment of Falun Gong practitioners," and has sanctioned Chinese officials for "gross violations of human rights," including

"particularly severe violations of religious freedom." Brief for United States as *Amicus Curiae* on Pet. for Cert. 9. Similarly, in 2020, the Trump administration released a report on the Government's strategic approach to China that highlighted how the Government had released "statements calling on the [Chinese] government to respect the rights of" religious minorities including "Falun Gong adherents, all of whom face repression and persecution in China"; the report also announced that the "United States will continue to take a principled stand against the use of our technology to support China's military and its technology-enabled authoritarianism."[2] In addition, the State Department has "denounce[d]" China's "particularly abhorrent behavior" toward Falun Gong. Dept. of State, Annual Report on International Religious Freedom 2000, 106th Cong., 2d Sess., xxix, xxxii (Joint Comm. Print 2000). So has Congress. See, *e.g.*, H. Res. 605, 111th Cong., p. 5 (2010) (condemning the Chinese Government's "campaign to persecute, intimidate, imprison, and torture Falun Gong practitioners"); see also Brief for Members of Congress et al. as *Amici Curiae* 22–26 (listing other congressional resolutions and actions condemning China's persecution of Falun Gong). Given that both political branches have so publicly and directly condemned China's persecution of Falun Gong members, it strains credulity to say that allowing a private suit against an American company to proceed would meaningfully change the state of relations between the United States and China.

In addition, any potential foreign-policy consequences are further reduced because neither China nor any Chinese instrumentality is a party to the case itself. Rather, the suit

———————

[2] National Security Council, United States Strategic Approach to the People's Republic of China 15 (2020), https://trumpwhitehouse.archives. gov/wp-content/uploads/2020/05/U.S.-Strategic-Approach-to-The-Peoples-Republic-of-China-Report-5.24v1.pdf (archived at https://perma.cc/ 2PHC-HLKP).

is against an American company and focuses primarily on its conduct in the United States. China also could have appeared in this case if it opposed it. It could have filed a brief in this case saying so, just as it did in a previous ATS case that involved China. See *Doe* v. *Qi*, 349 F. Supp. 2d 1258, 1264, 1296–1301 (ND Cal. 2004) (noting that, in an ATS suit against Chinese local-government officials, China, "through the United States Department of State, submitted a letter to this Court urging this Court not to assert jurisdiction over the instant cases"). Other foreign states have filed similar materials in other ATS cases. See, *e.g.*, *Jesner*, 584 U. S., at 271 (citing brief filed by the Hashemite Kingdom of Jordan in ATS suit against a Jordanian bank). That China has not done so here is additional evidence that this case is unlikely to aggravate U. S.–China relations.

Second, Cisco and the United States argue that this Court's decision in *Central Bank of Denver, N. A.* v. *First Interstate Bank of Denver, N. A.*, 511 U. S. 164 (1994), forecloses aiding-and-abetting liability here, reading that case to permit aiding-and-abetting liability only if a statute expressly so states. *Central Bank* has minimal bearing here. It involved the Securities Exchange Act of 1934, the text of which limits liability to those who "'directly or indirectly'" engage in certain kinds of conduct. *Id.*, at 171. The Court there recognized that Congress "has taken a statute-by-statute approach to civil aiding and abetting." *Id.*, at 182. The Court reasoned that the text of that statute did not extend liability to aiders and abettors because they do not necessarily engage in the underlying activity they facilitate. *Id.*, at 176–177. That conclusion was buttressed by the fact that it was "uncertain" whether state common law supplied "a deeply rooted background of aiding and abetting tort liability." *Id.*, at 181–182, 184. Here, by contrast, the ATS does not limit liability to those who engage in certain acts. Instead, it authorizes courts to entertain suits involving a "tort . . . committed in violation of the law of nations."

§1350. As noted above, Cisco does not dispute that liability for aiding and abetting the seven underlying violations is universally recognized in international law. *Central Bank*'s holding about a textually distinct statute rooted in domestic law thus says little about what the ATS recognizes under international law.

Because Cisco does not dispute that *Sosa*'s first step is satisfied and has not identified a sound reason for this suit not to proceed at *Sosa*'s second step, the Court should affirm the Ninth Circuit's judgment.[3]

## III

The majority, however, is in a rush. Not wanting to dally on niceties like binding precedent, or to confine itself to deciding the case before it, the majority casts aside *Sosa*'s two-step framework altogether. It disclaims any future authority by any court to find additional causes of action in all cases to come, even though it declines to disturb the three implied causes of action previously recognized under the ATS. *Ante*, at 1. In short, it overturns *Sosa*. In doing so, the Court brushes past the *stare decisis* factors that this

_____

[3] The Ninth Circuit treated aiding-and-abetting liability as the relevant international-law norm at *Sosa*'s first step, concluding that "customary international law recognizes aiding and abetting liability as a specific and universal form of liability." 73 F. 4th 700, 718 (2023). Arguably, however, the relevant norm for the *Sosa* analysis might be the underlying offense that Cisco allegedly aided, such as torture. Whether aiding-and-abetting liability is available would then be assessed simply by determining the substantive breadth and scope of liability of a norm that has been sufficiently established. See 113 F. 4th 1230, 1243 (CA9 2024) (Bumatay, J., dissenting from denial of reh'g en banc). For example, Blackstone described slightly varying scopes of secondary liability as to each of the three offenses he identified. See 4 W. Blackstone, Commentaries on the Laws of England 69–73 (1769). If the majority were inclined to preserve *Sosa*'s two-step framework, and if the parties disputed *Sosa*'s first step at all before this Court, the Court could have vacated and remanded this case for the Ninth Circuit to reconsider what the relevant norm is for purposes of *Sosa*'s first step.

Court considers when deciding whether to overturn prece-
dent. It also slams the door in the faces of victims of horrific
mistreatment without giving any reason to think that Con-
gress, whom the Court purports to respect, would have
wanted to do so. The majority errs at each turn.

## A

To begin, the majority fails to demonstrate that *Sosa* is
wrong, never mind that there is the special justification
needed to overturn it.

Start with the common ground: There is no dispute that
the ATS contains judicially implied causes of action. Spe-
cifically, it contains implied causes of action for "'violation
of safe conducts, infringement of the rights of ambassadors,
and piracy.'" *Ante*, at 4 (quoting *Sosa*, 542 U. S., at 715).
Those causes of action appear nowhere in the ATS's text.
They instead come from authoritative accounts of interna-
tional law, most notably the work of 18th century English
jurist William Blackstone. See 4 W. Blackstone, Commen-
taries on the Laws of England 68 (1769). (Hence the moni-
ker "Blackstone three.") As *Sosa* explained, suits alleging
violations of safe conducts, infringements on the rights of
ambassadors, and acts of piracy all may proceed under the
ATS because Congress likely had these three offenses "in
mind" when it passed the ATS, even if it did not say so ex-
pressly. 542 U. S., at 724–725.[4]

_____

[4] The majority attempts to distance itself from the notion that the ATS
contains implied private rights of action for the Blackstone three, saying
that *Sosa* merely assumed that the Blackstone three would be actionable
under the ATS. See *ante*, at 12, and n. 3. That is perplexing. *Sosa*
explained at length that the First Congress did not intend to leave the
ATS "lying fallow" and that Congress instead intended for at least the
Blackstone three to be actionable. See 542 U. S. 692, 712–724. To the
extent the majority is unsure that even the Blackstone three are action-
able under the ATS, it is unclear why the majority is willing to leave the
door ajar for those three causes of action but not for any others that en-
force similarly well-established norms of international law.

If the ATS allows these three implied causes of action drawn from international law, then it is hard to see why it does not allow others similarly drawn from that body of law. Indeed, this is a key part of *Sosa*'s reasoning and its central holding. See *Bucklew* v. *Precythe*, 587 U. S. 119, 136 (2019) ("[J]ust as binding as [a case's] holding is the reasoning underlying it"). When Congress passed the ATS, "the accepted conception" of the common law was that federal courts, when adjudicating individual cases, were "discover[ing]" a pre-existing and "'transcendental body of law outside of any particular State'" and applying it. *Sosa*, 542 U. S., at 725. Working under that assumption, Congress omitted any specific causes of action from the ATS, see §1350, and left it to courts to draw upon the body of international law, which included the Blackstone three, and apply relevant principles in other, specific cases. *Id.*, at 724–725, 730.

Ample historical evidence corroborates *Sosa*'s account of the ATS. The First Congress passed the ATS after the Continental Congress (operating under the Articles of Confederation) "was hamstrung by its inability to 'cause infractions of treaties, or of the law of nations to be punished.'" *Id.*, at 716 (quoting J. Madison, Journal of the Constitutional Convention 60 (E. Scott ed. 1893)). For example, on at least two occasions prior to the Constitution's ratification, foreign diplomats were assaulted on American soil. 542 U. S., at 716–717. The Continental Congress called on States to pass legislation authorizing their courts to hear cases involving violations of international law, but just one answered the call. *Id.*, at 716. Understandably offended, at least one foreign ambassador lodged a protest that was discussed during the Constitutional Convention. *Id.*, at 717. As *Sosa* explained, given the "anxieties of the preconstitutional period," it is unlikely that Congress intended for the ATS to serve only "as a jurisdictional convenience to be placed on the shelf for use by a future Congress or state legislature that might, someday, authorize the creation of

causes of action." *Id.*, at 719. Rather, Congress intended for its handiwork to have immediate effect, without further express creation of causes of action.

Contemporaneous legal sources discussing international incidents that transpired shortly after Congress passed the ATS further support *Sosa*'s holding. In 1792, Secretary of State Thomas Jefferson and Attorney General Edmund Randolph each issued an opinion addressing incidents in which Americans entered Spanish Florida and French Haiti, abducted slaves, and returned them to the United States. See T. Jefferson, Opinion on Offenses Against the Law of Nations (Dec. 3, 1792), in 24 The Papers of Thomas Jefferson 693–696 (J. Catanzariti ed. 1990) (Jefferson Opinion); E. Randolph, Opinion on Offenses Against the Law of Nations (Dec. 5, 1792), in 24 *id.*, at 702–703 (Randolph Opinion). Both agreed that federal courts could hear civil suits relating to these incidents under the ATS. Jefferson wrote that the ATS would cover any suit by "an alien . . . for a tort only," Jefferson Opinion 694 (emphasis deleted), while Randolph agreed that "damages may be recovered in the courts of the United States, under the jurisdictions established by the judicial law"—that is, under the ATS, Randolph Opinion 702. Similarly, in 1795, Attorney General William Bradford issued an opinion explaining that "Americans who had taken part in the French plunder of a British slave colony in Sierra Leone," and thus arguably breached a declaration of neutrality, "'no doubt'" could be held civilly liable "'in the courts of the United States; jurisdiction being expressly given to these courts in all cases where an alien sues for a tort only, in violation of the laws of nations, or a treaty of the United States.'" *Sosa*, 542 U. S., at 721 (quoting 1 Op. Atty. Gen. 57, 59).

Taken together, the opinions of these early American statesmen confirm that the ATS was understood to allow civil suits for violations of international law even without any express causes of action. They also support the

conclusion that the ATS was not understood to be limited
to the Blackstone three: None of these early incidents in-
volved safe conducts, ambassadors, or piracy at sea.  In-
stead, they involved violations of other international-law
principles, including neutrality and prohibitions on "plun-
der" and "robbery."  2 E. de Vattel, The Law of Nations, ch.
VI §78 (J. Chitty ed., 6th ed. 1844); see *Franchise Tax Bd.
of Cal.* v. *Hyatt*, 587 U. S. 230, 239 (2019) (describing de
Vattel as "the founding era's foremost expert on the law of
nations").  As *Sosa* did, the founding generation thus un-
derstood the ATS to leave the door open to other causes of
action rooted in the law of nations beyond the Blackstone
three.

The majority does not explain why implied causes of ac-
tion for the Blackstone three are permissible but implied
causes of action for any other norm of international law,
which either existed in 1791 or exist today, are not.  The
majority instead turns down a different road, one paved not
with the opinions of the Court, which are the law, but with
the opinions of individual Justices, which are not.  Despite
claiming that its "starting point is *Sosa*'s key insight," the
majority veers off with its very next paragraph.  *Ante*, at 7.
It observes that Justice Scalia, who concurred in part and
concurred in the judgment in *Sosa*, "would have stopped"
with just the Blackstone three, *ante*, at 7, and then in the
next paragraph, cites four more individual opinions ex-
pressing sympathy for that view, but none of which was the
controlling majority opinion.  See *ante*, at 8 (citing *Jesner*,
584 U. S., at 274 (THOMAS, J., concurring); *id.*, at 280–293
(GORSUCH, J., concurring in part and concurring in judg-
ment); *Nestlé*, 593 U. S., at 634–640 (opinion of THOMAS, J.);
*id.*, at 658 (ALITO, J., dissenting)).

These five opinions, however, are not, and never have
been, the law.  The *Sosa* majority expressly rejected the call
to stop at the Blackstone three, dismissing Justice Scalia's
position as "particularly unconvincing in light of what we

know about congressional understanding bearing on this issue." 542 U. S., at 729–730.  Nor did any of the subsequent opinions garner a majority, as the Court in each case rejected liability under the ATS on narrower grounds than the separate writings advocated.  See *Nestlé*, 593 U. S., at 634 (rejecting extraterritorial application of the ATS); *Jesner*, 584 U. S., at 270–272 (holding that *Sosa*'s second step counseled against extending ATS liability to foreign corporations).  To say something three times (or five) does not make it true.  See L. Carroll, The Hunting of the Snark (1876).

Setting that aside, the majority distills two points from its tour through separate writings: (1) judicial authority to recognize causes of action is "'narrow'" because ATS suits "by their nature implicate foreign policy"; and (2) "the power to create causes of action belongs to Congress." *Ante*, at 8–9.

Neither point explains why it respects Congress to recognize causes of action for the Blackstone three but not for other international-law principles that are sufficiently similar to those causes of action.  To the extent the majority thinks that the Blackstone three are uniquely supported by the historical record, that is doubtful for the reasons given above.  See *supra*, at 13–14.  There also is no indication that Congress intended to "tra[p]" the ATS "in amber." *United States* v. *Rahimi*, 602 U. S. 680, 691 (2024).[5]

In any event, this Court already resolved the majority's objections in *Sosa* itself.  First, *Sosa* explained that foreign-policy concerns can arise from the failure to provide

_____

[5] The majority's limit is also unfaithful to Blackstone.  Blackstone recognized secondary liability as part of the substantive offenses he identified.  See 4 Blackstone, Commentaries on the Laws of England, at 69–72. Thus, even if Blackstone supplied the authoritative account of suits available under the ATS, that would still permit liability to extend beyond just those who principally commit the three offenses Blackstone identified.

remedies for international-law violations just as they can
arise from the imposition of liability for such violations.
The founding generation was deeply concerned with foreign
tensions resulting from "the Continental Congress's inca-
pacity to deal with," and States' failures to provide remedies
for, international-law violations, especially when an Amer-
ican defendant was involved. 542 U. S., at 716–718. The
ATS was a direct response to those "anxieties of the precon-
stitutional period." *Id.,* at 719. Indeed, the incidents dis-
cussed above all came to the Federal Government's atten-
tion because foreign nations complained to the United
States about them. See, *e.g.*, Jefferson Opinion 693 (noting
complaints from Spanish and French diplomats); 1 Op.
Atty. Gen., at 58 (referring to complaint submitted by Brit-
ish minister).

Today, too, providing an American forum for interna-
tional-law violations can improve foreign relations, as evi-
denced by the fact that foreign sovereigns have sometimes
filed briefs expressing support for ongoing ATS litigation.
See, *e.g.*, *In re Estate of Ferdinand Marcos Hum. Rights Lit-
igation*, 94 F. 3d 539, 547 (CA9 1996) (noting that the Phil-
ippines "urged" an ATS "suit to proceed in American courts"
because "'relations may well be improved if Filipino citizens
see that justice is available in U. S. courts'"); *Sarei* v. *Rio
Tinto, PLC*, 671 F. 3d 736, 756 (CA9 2011) (noting that Pa-
pua New Guinea "expressly urged" that an ATS aiding-and-
abetting case "'be heard by courts in the United States'" be-
cause it would not "'adversely affec[t] any relations between
[Papua New Guinea] and the United States'"), judgt. va-
cated, 569 U. S. 945 (2013). Former United States Ambas-
sadors-at-Large for War Crimes also explain that authoriz-
ing aiding-and-abetting liability under the ATS "is
consonant with U. S. foreign policy interests" in light of the
United States' "consisten[t] promot[ion of] aiding and abet-
ting as an essential means for holding perpetrators of inter-
national crimes to account." Brief for Former U. S.

Ambassadors-at-Large for War Crimes Issues/Global Criminal Justice et al. as *Amici Curiae* 10, 12; see *id.*, at 9, 11–29 (describing the United States' role in supporting aiding-and-abetting liability in proceedings before the Nuremberg Tribunal and other international criminal courts).

Given that there are strong foreign-policy interests on both sides of the scale, *Sosa* correctly rejected the argument that fear of "adverse foreign policy consequences" should categorically preclude judicial involvement in this area. 542 U. S., at 728. Instead, although it stressed that courts must act "with great caution" when finding implied causes of action, *Sosa* left the door open to doing so. *Id.*, at 728, 731.[6]

Second, *Sosa* also fully addressed the majority's charge that, according to modern legal sensibilities, Congress, not courts, should create causes of action. Like today's Court, the *Sosa* Court was well aware that "this Court has recently and repeatedly said that a decision to create a private right of action is one better left to legislative judgment in the great majority of cases." *Id.*, at 727; see *ante*, at 9. Even so, *Sosa* explained that the First Congress, which passed the ATS, did not see things the same way and that it would be "particularly unconvincing" to impose present-day legal theories on a Congress from two centuries ago. 542 U. S., at 730. It would be "unreasonable," *Sosa* continued, to fault Congress for failing in 1791 to anticipate the prevailing legal fashion two centuries down the line and to calcify a statute that Congress intended to be flexible. *Ibid.*

For all these reasons, *Sosa* correctly held that courts may find implied private rights of action cognizable under the ATS, so long as they proceed with "great caution" and do not recognize causes of action dissimilar to the Blackstone

—————————
[6] The majority urges "judicial humility" when it comes to matters of foreign affairs. *Ante*, at 9, n. 1. True judicial humility, however, is following precedent and respecting the wisdom of the jurists who precede us.

three: that is, those "for violations of any international law norm with less definite content and acceptance . . . than the historical paradigms familiar when [the ATS] was enacted." *Id.*, at 728, 732.[7]

## B

Even if *Sosa* was wrongly decided, that still would not justify the result the majority reaches today. The rule of *stare decisis*, or "[a]dherence to precedent," this Court has explained, is "'a "foundation stone of the rule of law,"'" *Kisor* v. *Wilkie*, 588 U. S. 558, 586 (2019). This "important doctrine . . . ensure[s] that the law will not merely change erratically, but will develop in a principled and intelligible fashion." *Vasquez* v. *Hillery*, 474 U. S. 254, 265 (1986). It also "permits society to presume that bedrock principles are founded in the law rather than in the proclivities of individuals, and thereby contributes to the integrity of our constitutional system of government, both in appearance and in fact." *Id.*, at 265–266. Overturning a prior decision therefore requires "special justification"; "it is not alone sufficient that we would decide a case differently now than we did then." *Kimble* v. *Marvel Entertainment, LLC*, 576 U. S. 446, 455–456 (2015).

The majority, however, nowhere mentions *stare decisis*. Indeed, the Court's opinion does not even state the necessary consequence of what it decides today: that *Sosa* is overruled. Disturbingly, this is not the first time in recent years that the Court has been "willing to overrule precedent

---

[7]The majority claims that permitting courts to find implied causes of action in this way "would have confounded the First Congress." *Ante*, at 12, n. 3. Far from it: For all the reasons explained above and in *Sosa*, the First Congress expected courts to find causes of action that permit plaintiffs to recover damages for violations of norms of international law like the Blackstone three. What would have "confounded the First Congress" instead is today's decision to override those expectations and engraft a modern hostility to implied rights of action totally inconceivable to the First Congress and the founding generation.

without even acknowledging it is doing so, much less providing any special justification." *Jones* v. *Mississippi*, 593 U. S. 98, 144 (2021) (SOTOMAYOR, J., dissenting) (describing the Court's implicit overruling of *Miller* v. *Alabama*, 567 U. S. 460 (2012), and *Montgomery* v. *Louisiana*, 577 U. S. 190 (2016)). "How low this Court's respect for *stare decisis* has sunk." 593 U. S., at 144.

The majority's apparent disregard for *stare decisis* is particularly lamentable here because this Court has long held that *stare decisis* has "special force" as to decisions interpreting congressional statutes. *Patterson* v. *McLean Credit Union*, 491 U. S. 164, 172 (1989). That is because Congress, not this Court, has the primary responsibility to "correct any mistake[s]" in this Court's statutory decisions. *Kimble*, 576 U. S., at 456. Accordingly, this Court has consistently required a "superspecial justification to warrant reversing" a statutory precedent. *Id.*, at 458. This Court has applied this heightened standard "even when a decision has," like *Sosa*, "announced a 'judicially created doctrine' designed to implement a federal statute." 576 U. S., at 456.

When deciding whether to overturn a decision like *Sosa*, this Court will "most often" consider "subsequent legal developments—'either the growth of judicial doctrine or further action taken by Congress'—that have removed the basis for a decision." 576 U. S., at 458. Here, however, this "primary reason" for overruling statutory precedents, *Patterson*, 491 U. S., at 173, is completely absent. As discussed above, this Court's modern push to limit implied causes of action was well underway by the time *Sosa* was decided. See *supra*, at 17.

The majority says that "[s]ince *Sosa* was decided, we have firmly committed to the view that judicially created causes of action offend the separation of powers in almost every circumstance.'" *Ante*, at 10. It relies primarily on cases concerning not implied causes of action under the ATS, but cases from this Court's *Bivens* jurisprudence. See *ante*, at

10 (citing, among others, *Egbert* v. *Boule*, 596 U. S. 482 (2022); *Ziglar* v. *Abbasi*, 582 U. S. 120 (2017)). Those cases are far afield: They involved implying causes of action under the Constitution, not the ATS. There are, of course, many differences between the Constitution and the ATS, chief among which is that Congress passed the ATS specifically to furnish a path for plaintiffs to recover monetary damages. See *Sosa*, 542 U. S., at 724. Setting those differences aside, by the time this Court decided *Sosa* in 2004, it was already "firmly committed," *ante*, at 10, to limiting implied rights of action. Indeed, years before *Sosa*, this Court had already "sworn off" the habit of implying private causes of action outside the ATS. *Alexander* v. *Sandoval*, 532 U. S. 275, 287 (2001); see *Sosa*, 542 U. S., at 727 (citing *Alexander*). Even so, *Sosa* confronted that issue and held that courts may find implied rights of action under the ATS. The cases the majority cites from the *Bivens* context therefore did not unearth some new objection not considered by the *Sosa* Court, "remov[e] the basis for [*Sosa*]," *Kimble*, 576 U. S., at 458, or render *Sosa* "irreconcilable with competing legal doctrines or policies," *Patterson*, 491 U. S., at 173.

Nor has Congress amended the ATS or passed other legislation that undercuts *Sosa*'s holding. *Sosa* itself "welcome[d] any congressional guidance" over the interpretation of the ATS and how courts proceed when defining causes of action. 542 U. S., at 731. It also reiterated that "Congress may" close the door to new causes of action "at any time (explicitly, or implicitly by treaties or statutes that occupy the field), just as it may modify or cancel any judicial decision so far as it rests on recognizing an international norm as such." *Ibid*. Yet Congress has done none of this in response to *Sosa*.[8]

_____

[8] The majority suggests that the TVPA displaced *Sosa*. *Ante*, at 10–11. Congress, however, passed the TVPA in 1991, 13 years before this Court

The other circumstance in which this Court will sometimes overturn a statutory precedent is if its standard has "prove[n] unworkable." *Kimble*, 576 U. S., at 459. Here, there is no reason to think that is true of *Sosa*'s two-step framework. No one argues before this Court that *Sosa*'s steps are unclear or hard to apply. Instead, Cisco argues that *Sosa* and the ATS have allowed causes of action to proliferate, ensnaring defendants and courts in litigation. See Brief for Petitioners 26.

No evidence supports Cisco's worries. Federal courts have been restrained in recognizing new causes of action under *Sosa*. One study found that, as of 2022, just 300 ATS suits had ever been filed in federal courts. C. Ewell, O. Hathaway, & E. Nohle, Has the Alien Tort Statute Made a Difference?: A Historical, Empirical, and Normative Assessment, 107 Cornell L. Rev. 1205, 1240 (2022) (Ewell). Fifty-two cases succeeded, and of the 248 cases that were dismissed, over one-third of them were dismissed at *Sosa*'s first step because the plaintiffs had not identified an actionable violation of international law to begin with. Ewell 1241.

---

decided *Sosa*. It is bizarre to say that a statute that predates *Sosa* now undercuts *Sosa*'s holding. In any event, rather than being an "'alternative remedial structure,'" *ante*, at 10–11, that displaces *Sosa*, the TVPA indicates Congress's approval of implied rights of action under the ATS. Before *Sosa*, the Second Circuit had held that courts may imply private rights of action under the ATS for torture. See *Filartiga* v. *Pena-Irala*, 630 F. 2d 876, 877–878 (1980). As I have previously explained, Congress was well aware of *Filartiga* and passed the TVPA to "supplement the ATS" by extending a civil remedy to U. S. citizens who cannot sue under the ATS. *Jesner* v. *Arab Bank, PLC*, 584 U. S. 241, 316 (2018) (dissenting opinion). As the congressional Committee Reports noted, the ATS was intended to "'remain intact to permit suits based on other norms that already exist or may ripen in the future into rules of customary international law.'" *Sosa*, 542 U. S., at 728 (quoting H. R. Rep. No. 102–367, pt. 1, p. 4 (1991)); see also *Jesner*, 584 U. S., at 316 (opinion of SOTOMAYOR, J.) (discussing this legislative history).

Two observations follow from this study.  First, there is
no real reason to think that ATS suits are clogging federal
courts' dockets, as 300 cases across multiple centuries re-
flect a tiny fraction of the hundreds of thousands of civil
cases that are filed in federal courts each year.[9]  Second,
this Court's cases narrowing ATS liability have had a sig-
nificant, and effective, role in reining in federal courts and
controlling the proliferation of implied causes of action for
violations of international law.  For example, the number of
filed ATS cases fell precipitously after this Court held that
the ATS does not apply extraterritorially.  Ewell 1237–1238
(discussing *Kiobel* v. *Royal Dutch Petroleum Co.*, 569 U. S.
108 (2013)).  Putting these points together, there is no rea-
son to think that *Sosa*'s framework has become, or is at risk
of becoming, unmanageable.[10]

Again, the majority largely skips over the *stare decisis*
analysis and prefers instead to decree that Justice Scalia
was right in *Sosa* after all.  *Ante*, at 7–12.  In so doing, the
majority forgets that while creating causes of action may be
a task primarily for Congress, so too is correcting erroneous
interpretations of statutes.  See *Kimble*, 576 U. S., at 460.
In nonetheless reaching out to correct a perceived error in
*Sosa*, the Court does not honor the constitutional division
of labor between Congress and this Court.  Instead, it

––––––––––

[9] See United States Courts, Federal Judicial Caseload Statistics 2025
(2025), https://www.uscourts.gov/data-news/reports/statistical-reports/
federal-judicial-caseload-statistics/federal-judicial-caseload-statistics-2025
(archived at https://perma.cc/MHE5-SXWX) (reporting 271,802 new civil
filings in federal district court in 2025).

[10] The majority notes that some ATS suits have resulted in settlements
in which plaintiffs and defendants have agreed to end litigation and com-
pensate the plaintiffs in "'multimillion-dollar'" suits.  See *ante*, at 11,
n. 2.  The majority seems to suggest that somehow these settlements are
objectionable, but there is no reason to think that voluntary agreements
to compensate victims of heinous conduct are inherently unfair or other-
wise undesirable.

disrespects it. Proper respect for Congress should have led to a different outcome today.

Moreover, even if Justice Scalia did get it right in 2004, "[l]ost arguments are not grounds to overrule a case." *Students for Fair Admissions, Inc.* v. *President and Fellows of Harvard College*, 600 U. S. 181, 352 (2023) (SOTOMAYOR, J., dissenting). "When proponents of [previously rejected] arguments, greater now in number on the Court, return to fight old battles anew, it betrays an unrestrained disregard for precedent." *Id.*, at 352–353. That is exactly what the majority again exhibits today.

C

The majority wraps up its discussion of *Sosa* by asserting that "it is hard to see how correcting *Sosa*'s unfulfilled prediction would upset reliance interests" because "it is a stretch to believe that we ever would have" found an implied right of action under *Sosa*. *Ante*, at 11. The majority, however, overlooks the 107 other federal courts. Many of them fulfilled this Court's prediction by finding implied causes of action under the ATS in individual cases, just as the First Congress intended. Those courts were not "'indulg[ing a] fiction.'" *Ibid.* Rather, they were dutifully applying this Court's decision in *Sosa*, and their decisions are proof that *Sosa* "'operated in practice.'" *Ante*, at 11. It is therefore unclear what the majority means when it says that *Sosa*'s promise went unfulfilled, or that no one, not even the plaintiffs who sued under the ATS, was entitled to rely on it.

What is clear is that the majority today forecloses future reliance on *Sosa* and shuts the courthouse doors to almost any claimed violation of international law under the ATS. That includes torture. See, *e.g.*, *Filartiga* v. *Pena-Irala*, 630 F. 2d 876, 878 (CA2 1980) (ATS suit brought by plaintiff alleging that his son had been kidnapped and tortured to death in retaliation for the plaintiff's political beliefs). It

includes forced labor. See, *e.g.*, *Licea* v. *Curacao Drydock Co.*, 584 F. Supp. 2d 1355, 1359 (SD Fla. 2008) (ATS suit alleging that the defendant trafficked Cubans to Curacao, held them in captivity, and forced them to work repairing ships and oil platforms). It also includes perhaps the most universally condemned crime in the modern era: genocide. See, *e.g.*, *Kadic* v. *Karadzic*, 70 F. 3d 232, 236–237 (CA2 1995) (ATS suit alleging "brutal acts of rape, forced prostitution, forced impregnation, torture, and summary execution, carried out by Bosnian-Serb military forces as part of a genocidal campaign"). "Like the pirates of the 18th century," whose conduct so concerned Blackstone and the First Congress, "today's torturers, slave traders, and perpetrators of genocide are '*hostis humani generis*, an enemy of all mankind.'" *Nestlé*, 593 U. S., at 647 (opinion of SOTOMAYOR, J.).

As to each of these offenses, as to each of these enemies of mankind, the majority decides that there is simply no way that a suit could possibly proceed without offending Congress. Noticeably absent from the majority's analysis is any evidence that Congress would be offended by these suits. Of course, there may be reasons why allowing an individual ATS suit to proceed would be unwise. That possibility, however, should be addressed on a case-by-case basis. Indeed, that option was available in this very case. Even though the analysis of the dissenting judge below was mistaken for the reasons given above, see *supra*, at 5–10, it at least applied *Sosa* and concluded that allowing this specific suit to proceed would not be an appropriate exercise of judicial discretion, see 73 F. 4th, at 748–751. The possibility that one case should not be allowed through the door is no reason to weld the door shut and lock out all others.

## IV

The majority also errs by holding that the TVPA does not allow plaintiffs to sue for the aiding and abetting of torture.

The TVPA states that "[a]n individual who . . . subjects an individual to torture shall, in a civil action, be liable for damages to that individual." Note following 28 U. S. C. §1350 (Establishment of Civic Action) (§1350 note). This Court has already acknowledged that this language extends beyond those who "personally execute the torture." *Mohamad* v. *Palestinian Authority*, 566 U. S. 449, 458 (2012). This Court has also explained that aiding and abetting requires that "the defendant consciously and culpably 'participate[d]' in a wrongful act so as to help 'make it succeed.'" *Twitter, Inc.* v. *Taamneh*, 598 U. S. 471, 493 (2023).

Putting the terms "subjects" and "aiding and abetting" together yields a simple answer. In ordinary meaning, a person "subjects" another to torture if he "consciously and culpably 'participate[s]' in" the torture "so as to help 'make it succeed.'" *Ibid.* Imagine an individual who rounds people up and delivers them to a black site to be tortured by another person. Or a company that sets up the torture chamber with all the necessary tools. Or an informant who provides sensitive information about the victim so that another person can tailor the torture to the victim's weaknesses. None of these actors conducted the torture themselves, but they have all "subjected" those people to torture by "culpably 'participat[ing]' in" it and helping to "'make it succeed.'" *Ibid.*

Dictionary definitions reinforce this understanding. Dictionaries define "subjects" to mean "to cause to undergo or submit to" or to "expose." Webster's Third New International Dictionary 2275 (1993) (capitalization modified); see American Heritage Dictionary 807 (3d ed. 1992) ("[t]o expose to something," "[t]o cause to experience"). A person plainly causes, exposes, or otherwise makes someone submit to torture when she "consciously and culpably 'participat[es]' in" it. *Twitter*, 598 U. S., at 493; see also Restatement (Second) of Torts §876, Comment *d* (1977) (explaining that, under the common law, aiding and abetting requires

proving the "assistance is a substantial factor in causing the resulting tort").

The majority's narrow interpretation of the word "subjects" is also incompatible with another form of secondary liability that all agree is covered by the TVPA: command responsibility. See Brief for Petitioners 41; Brief for United States as *Amicus Curiae* 31–32. Command responsibility holds superior officers vicariously liable for the actions of their subordinates. It generally requires showing that the superior "knew, or should have known," that subordinates had or were about to commit torture and "failed to take all necessary and reasonable measures to prevent" it. *Chavez* v. *Carranza*, 559 F. 3d 486, 499 (CA6 2009); see *Mohamad*, 566 U. S., at 458 (approvingly citing *Chavez*). It requires showing neither "proximate cause" nor that the officer participated in the torture. See *Chavez*, 559 F. 3d, at 499. That the TVPA extends such attenuated liability to someone who did not participate in torture suggests that it also holds liable someone who culpably participates in torture, such as someone who provides tools to the torturer. Contra, *ante*, at 14, n. 4.

Finally, the majority's reliance on *Central Bank* is misplaced. As discussed above, that case interpreted a statute imposing liability on someone who "'directly or indirectly'" engaged in proscribed acts. 511 U. S., at 176. That language is narrower than the TVPA's operative language that extends liability to anyone who "subjects" another to torture. Yet by extending *Central Bank* in this way, the majority effectively creates a magic-words test and "impose[s] a 'clarity tax' on Congress by demanding that it speak unequivocally if it wants to" impose aiding-and-abetting liability. *Biden* v. *Nebraska*, 600 U. S. 477, 508 (2023) (BARRETT, J., concurring) (quoting J. Manning, Clear Statement Rules and the Constitution, 110 Colum. L. Rev. 399, 403 (2010)). Even in contexts where this Court requires a clear statement, like waivers of sovereign immunity, this Court has

emphasized that "'no magic words are required'" because the "fact that Congress chose to use certain language" in one statute "hardly means it was 'foreclose[d] . . . from using different language to accomplish th[e] same goal.'" *Department of Agriculture Rural Development Rural Housing Service* v. *Kirtz*, 601 U. S. 42, 52 (2024); see *Sebelius* v. *Auburn Regional Medical Center*, 568 U. S. 145, 153 (2013) (emphasizing Congress need not "incant magic words" to make clear that a statutory limitation is jurisdictional). The majority offers no reason why magic words would be required in this context.

At bottom, the TVPA expressly authorizes victims of torture to sue any "individual who . . . subjects [them] to torture." §1350 note. Because the plain text of this statute includes individuals who aid and abet the victim's torture, I would affirm the Ninth Circuit's judgment on this score as well.

V

The Court's decision today is yet another notch in its belt, unabashedly remaking the law in its preferred image. The majority jettisons two decades of settled precedent and breathes new life into two decades of rejected legal theories. It does all this in the name of respecting Congress and the separation of powers. Yet in fixating on the separation of powers, the majority ignores the foundations of its own and shakes the public's confidence in the stable and predictable development of the law. Because resolving this case did not require inflicting these wounds, I respectfully dissent.